# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| BRIAN A., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. Act. No. 3:00-0445 |
| | ) | Judge Todd J. Campbell |
| v. | ) | Magistrate Judge Joe B. Brown |
| | ) | |
| BILL HASLAM, et al. | ) | |
| | ) | |
| Defendants. | | |

---

## JULY 2011 MODIFIED SETTLEMENT AGREEMENT AND EXIT PLAN

---

# TABLE OF CONTENTS

Preamble ........................................................................................................................3
I.      Principles of the July 2011 Modified Settlement Agreement and Exit Plan and Definitions ...3
        A.      Principles of the July 2011 Modified Settlement Agreement and Exit Plan ..........3
        B.      Class Definition ...................................................................................5
        C.      Principles of Tennessee's Child and Family Team Meeting Model......................5
        D.      Definition of Provisions Identified as "MAINTENANCE" ..................................6
        E.      Other Definitions ................................................................................6
II.     Structure of the Agency ..........................................................................................7
III.    Reporting Abuse and Neglect ..................................................................................7
IV.     Regional Services...................................................................................................7
V.      Staff Qualifications, Training, Caseloads, and Supervision .............................................8
VI.     Placement and Supervision of Children......................................................................12
VII.    Planning for Children: Minimum Standards for All Children and Youth .........................17
VIII.   Freeing a Child for Adoption...................................................................................19
IX.     Resource Parent Recruitment, Retention, and Approval ................................................22
X.      Statewide Information System..................................................................................24
XI.     Quality Assurance.................................................................................................24
XII.    Supervision of Private Provider Agencies .................................................................26
XIII.   Financial Development...........................................................................................27
XIV.    Technical Assistance Committee..............................................................................28
XV.     Monitoring ...........................................................................................................28
XVI.    Outcome and Performance Measures ........................................................................29
XVII.   Modification.........................................................................................................33
XVIII.  Enforcement, Termination and Exit..........................................................................33
        A.      General Principles Guiding Enforcement ...........................................................33
        B.      Dispute Resolution.................................................................................33
        C.      Identification of "MAINTENANCE" Provisions.................................................34
        D.      Termination and Exit ..............................................................................34
XIX.    External Accountability Reporting Structure ..............................................................35
XX.     Attorneys Fees and Expenses..................................................................................35

A.    This July 2011 Modified Settlement Agreement and Exit Plan (hereinafter "this agreement") supersedes and replaces the 2010 Modified Settlement Agreement and Exit Plan. Subsequent to the resolution of Plaintiffs' Motion for Contempt in 2003, Defendants have made progress toward meeting their legal obligations in this action. Accordingly, the parties have negotiated this binding agreement. Pursuant to Section XVIII.D.2, the parties have agreed to the achievements which will allow, upon the Court's approval, termination of jurisdiction over this action.

B.    This court has subject matter jurisdiction and personal jurisdiction over this action and therefore the authority to enter this agreement.

C.    This court shall have continuing jurisdiction of this action to ensure compliance with the terms of this agreement.

D.    Any state agency responsible for the care, protection, and/or supervision of plaintiff class members shall be bound by the provisions of this agreement. For as long as this agreement remains in effect, all provisions referring to the "Department," the "Department of Children's Services" or "DCS," upon any subsequent changes to the current governmental organizational structure of the Tennessee Department of Children's Services concerning the children in the plaintiff class as defined herein, shall apply with full force and effect to the State of Tennessee and to any subsequent agency or agencies with any of the responsibilities that apply to the current DCS as of the date of this agreement.

E.    This agreement, and any of its provisions, are not, and shall not be construed to be, an admission of any liability on the part of any of the defendants concerning any of the claims and allegations in the complaint in this litigation.

I.    PRINCIPLES OF THE JULY 2011 MODIFIED SETTLEMENT AGREEMENT AND EXIT PLAN AND DEFINITIONS

A.    Principles of the July 2011 Modified Settlement Agreement and Exit Plan

1.    All children should have the best possible opportunity to grow up within a safe, nurturing family, either their biological family or, if that is not possible, within an adoptive family.

2.    The state should make reasonable efforts to avoid foster care placement by providing services to preserve the biological family whenever that is reasonably possible, separating the child from the child's parents only when necessary for the child's welfare or in the interest of the child's safety. However, child welfare decision-makers must have the professional capacity to make determinations as to when making efforts to preserve the biological family, or leaving the child with that family, is

neither safe for the child nor likely to lead to an appropriate result for the child.

3.  After children enter placement, all non-destructive family ties should be maintained and nurtured. Children should be placed with relatives who are able to provide a safe, nurturing home for them, and should be placed with siblings, and relationships with relatives and siblings should be facilitated and maintained by the child welfare agency.

4.  Foster care should be as temporary as possible, aimed at providing a permanent home for the child as quickly as possible. In determining what plans and services will best meet this goal, the child's interests must be paramount.

5.  The state has primary responsibility for the care and protection of children who enter the foster care system. Insofar as it relies on private provider agencies to assist in meeting this responsibility, it should only do so according to standards set by and rigorously monitored by the state.

6.  All children in need of child welfare services should receive full and equal access to the best available services, regardless of race, religion, ethnicity, or disabilities.

7.  Children in foster care should be placed in accordance with their individual needs, as close to home and community as possible, in the least restrictive, most family-like setting possible. The state should make all efforts to avoid the use of non-family settings for children, particularly young children.

8.  Children in foster care should have stable placements that meet their needs and the services necessary to address both the trauma of foster care placement and the problems surrounding their removal from their family.

9.  Children in out-of-home placement must have timely decision-making and implementation about where and with whom they will spend their childhood.

10. Families of children in foster care should be significant participants in the planning and decision-making concerning their children.

11. All parties in judicial proceedings involving neglect, abuse, unruly and delinquency should be provided a fair hearing and their constitutional and other legal rights should be enforced and recognized.

12. Except where a particular provision of this agreement establishes a specific limit on the resources required to be allocated, Defendants shall

commit all necessary resources (administrative, personnel, financial and otherwise) to implement all provisions herein.

13.    All actions required for plaintiff class members shall be documented within their individual case file. DCS shall be able to produce aggregate data requested by the Monitor concerning compliance with the provisions herein.

14.    All reports made available pursuant to this agreement shall be public information, provided that if any report contains individually identifiable information, such individually identifiable information shall not be made public.

B.    Class Definition

Pursuant to the terms of this agreement, this case shall be certified as a class action and the class certified shall be defined as follows: All foster children who are or will be in the legal custody of DCS. "Foster children" shall mean all children who are or will be in the legal custody of DCS, excluding children who are or will be in the legal custody of DCS upon an allegation or adjudication of a delinquent or criminal act. Children who are or will be in the custody of DCS upon an allegation or adjudication of an unruly or status offense shall be included in the class, and children who are or will be in the custody of DCS upon on allegation of a delinquent or criminal act and which allegation is subsequently dropped or fails to result in an adjudication of a delinquent or criminal act and who remain in the legal custody of DCS, shall be included in the class.

C.    Principles of Tennessee's Child and Family Team Meeting Model

Tennessee has adopted a model for engaging children, family members and their own support persons in the process of ensuring the safety, permanency and well-being of class members. Tennessee's Child and Family Team Meeting (CFTM) model shall be guided by the following principles:

1.    All children in foster care must have a CFTM that meets regularly throughout a child's time in custody, that utilizes the CFTM process for assessment and planning, that monitors and tracks the implementation of the plan, and that reconvenes as needed but no less often than every three (3) months to adjust the plan and respond to new issues.

2.    In addition to the child/youth, his or her family, and the child's case manager, the Child and Family Team should include and engage people who represent both formal and informal supports for the family.

3.    Except in emergencies, CFTMs should include pre-meeting preparation with the family and child, including face-to-face meetings as appropriate.

4. Children should not enter custody, should not have a permanency plan established or updated, should not disrupt from a placement, and should not be discharged from care without the convening of a CFTM.

5. Case managers should effectively serve as the primary persons responsible for the Child and Family Team Process.

D. Definition of Provisions Identified as "MAINTENANCE"

1. Specific provisions in this agreement are followed by the term MAINTENANCE. In some sections, a whole paragraph is followed by a skipped space and then the term MAINTENANCE below it.

2. For Sections II – XIII, the term MAINTENANCE shall mean, for the sentence immediately preceding the term, or for the paragraph immediately above the term, that if Defendants maintain or improve the performance with such provision(s) as reported by the technical assistance committee ("TAC") (defined in Section XIV of this agreement) in the monitoring report that immediately preceded the initial court-approved identification of the sentence or paragraph as MAINTENANCE, such performance shall be considered substantial compliance for purposes of Termination and Exit under Section XVIII.

3. For Section XVI, the term MAINTENANCE shall mean, for the paragraph immediately above the term, that: (a) if Defendants maintain or improve the performance with such provision(s) as reported by the TAC in the monitoring report that immediately preceded the initial court-approved identification of the sentence or paragraph as MAINTENANCE, such performance shall be considered substantial compliance for purposes of Termination and Exit under Section XVIII; or (b) if Defendants' performance in the monitoring report that immediately preceded the initial court-approved identification of the sentence or paragraph as MAINTENANCE, meets or exceeds that required in Section XVI, and Defendants maintain or improve upon the required level of performance in Section XVI, such performance shall be considered substantial compliance for purposes of Termination and Exit under Section XVIII.

E. Other Definitions

1. A child shall be considered to have entered foster care custody on the date that the child enters DCS's physical, out-of-home custody, or on the date on which the child enters DCS's legal custody, whichever is sooner. The duration of a child's time in DCS custody shall include the entire time period after which a child entered custody until formally discharged from DCS custody.

2. Race and/or ethnicity and/or religion shall not be the basis for a delay or

denial in the placement of a child. Race and/or ethnicity shall otherwise be appropriate considerations in evaluating the best interest of an individual child to be matched with a particular family.

II. STRUCTURE OF THE AGENCY

A. DCS shall establish child welfare policy and determine statewide standards. DCS shall take all reasonable steps necessary to ensure that statewide policies, standards and practices are implemented and maintained in each region of the state and that each region uses uniform forms, data collection, and reporting. Regions retain the right to develop and use forms and data instruments to address issues of local concern.

**MAINTENANCE.**

III. REPORTING ABUSE AND NEGLECT

A. DCS's system for receiving, screening and investigating reports of child abuse and neglect for foster children in state custody shall be adequately staffed and all reports of abuse or neglect of class members shall be investigated in the manner and within the time frame provided by law.

B. All reports of abuse or neglect of foster children occurring in DCS and private provider placements (whether congregate care or resource home) shall also be referred to and reviewed by the relevant DCS unit or units responsible for quality assurance and placement and provider oversight, with such referral and review completed within ninety days. The quality assurance unit(s) shall be responsible for ensuring that appropriate corrective action is taken with respect to the placement and/or private provider (including, if appropriate, closing of the placement and/or contract termination), and shall determine whether a pattern of abuse or neglect exists within the placement or the private provider's array of placements that contributed to the abuse and neglect. The results of the reviews required in this section shall be incorporated into the performance based contracting provided by DCS.

C. The quality assurance division shall ensure that a tracking and reporting process is in place to identify any case in which there have been three or more reports of neglect or abuse concerning a particular caregiver for a particular class member and that all such cases are subject to special administrative reviews.

IV. REGIONAL SERVICES

A. Each region shall have available a full range of community-based services to support and preserve families of foster children in state custody, and to enable children to be reunified with their families safely and as quickly as possible.

B.  Each region shall have available or shall develop a full range of community-based family services, which shall be available to:

1.  Foster families for whom children have established a significant, beneficial emotional bond and which provide the possibility of long-term stability and permanence, but which are in danger of disrupting without intensive home-based crisis intervention services;

2.  Families to whom children in foster care could be returned safely with the availability of intensive family services for a transition period; and

3.  Adoptive families in danger of disrupting without intensive home-based crisis intervention services.

V.  STAFF QUALIFICATIONS, TRAINING, CASELOADS, AND SUPERVISION

A.  All persons applying for positions with DCS or a private provider agency which involve any contact with children shall be required to submit to a criminal records check and a DCS abuse and neglect records screening before beginning training or employment. All DCS and private provider staff are subject to the provisions of DCS administrative policy on Employee Background Checks, which provide specific requirements for finger-printing, background checks, employment and disciplinary action. All DCS staff are also subject to the DCS administrative policy on employee disciplinary actions related to allegations or convictions of criminal acts. This section is not applicable to employees convicted of delinquent offenses.

B.  Educational background requirements for DCS case managers responsible for cases of class members and for private provider staff with comparable responsibilities shall be as follows:

1.  Case managers I and II shall have a bachelor's degree, with employment preference given to applicants holding a bachelor's degree in social work or a related behavioral science.

    **MAINTENANCE.**

2.  Case managers III shall have at least a bachelor's degree, with employment preference given to applicants holding a bachelor's degree in social work or a related behavioral science, and two years experience in providing child welfare services. A master's degree in social work or a related behavioral science may substitute for one year experience in providing child welfare services.

    **MAINTENANCE.**

3. All case manager supervisors (including team leaders and team coordinators) shall have a minimum of a master's degree in social work or a related behavioral field with a child and family focus (excluding criminal justice) and at least three years experience as a child welfare case worker; however, an additional 2 years of providing child welfare services may substitute for a master's degree.

   **MAINTENANCE.**

C. Requirements for retention, promotion, and assumption of case responsibilities for DCS case managers responsible for cases of class members and for private provider staff with comparable responsibilities shall be as follows:

   1. No case manager shall be promoted until completing a job performance evaluation that includes evaluation of performance of the case management requirements of this agreement. Failure to receive a satisfactory job performance evaluation will result in progressive disciplinary action, up to termination if necessary.

   2. No case manager shall assume any responsibility for a case, except as part of a training caseload, until after completing pre-service training and after passing a skills-based competency test.

      **MAINTENANCE.**

   3. Every case manager supervisor shall complete basic supervisor training and pass a skills-based competency assessment geared specifically to child welfare supervision. Such training will begin within two weeks of the supervisor assuming supervisory responsibility and be completed within six months.

D. Pre-service and in-service training of DCS case managers responsible for cases of class members and private provider case managers with comparable responsibilities shall be as follows:

   1. A minimum of 160 hours of pre-service training, including instructional and supervised field training;

      **MAINTENANCE.**

   2. For non-supervising case managers, a minimum of 40 hours of annual in-service training;

      **MAINTENANCE.**

   3. For new supervisors, a minimum of 40 hours of in-service training

directed at the supervision of child welfare case workers, to begin within two weeks of assuming supervisory responsibility and to be completed within six months; and

4.  For supervisors, a minimum of 24 hours of in-service training each year.

E.  DCS shall have a full-time qualified director of training and shall maintain sufficient staffing, budget funds, and other resources to provide comprehensive child welfare training to ensure that all persons responsible for children in the plaintiff class will have sufficient training to permit them to comply with the relevant mandates of this agreement, DCS policy, and reasonable professional standards.

**MAINTENANCE.**

F.  Prior to contracting with any private provider, DCS will review, approve, and monitor the curriculum for caseworker pre-service and in-service training to assure that general content areas are appropriate to the work being performed by the agency. Where casework activities mirror the duties of the DCS case manager, the curriculum will correspond with DCS pre-service and in-service training.

G.  The state shall provide stipends and other incentives to support graduate work to enable the state to hire and retain case managers with undergraduate and graduate degrees in social work and related fields. The state will periodically assess whether salary increases are necessary to ensure that Tennessee is competitive with neighboring states in its compensation for case managers and case manager supervisors.

**MAINTENANCE.**

H.  The Department shall develop and implement a performance evaluation process which includes an annual assessment of the extent to which case managers and case manager supervisors are handling their case responsibilities consistently with the provisions of this agreement, DCS policy, and reasonable professional standards. The performance evaluation process shall ensure the identification of case managers needing additional training and that appropriate action (including reassignment or termination) is taken with respect to case managers who are not performing at acceptable levels.

I.  Prior to contracting or renewal with any private provide, the Department will ensure that each private provider agency has implemented an appropriate performance evaluation process to ensure the competency of those staff with responsibilities comparable to DCS case managers.

J.  A single case manager assigned to a case shall have full responsibility for that

case, including working with the child and family and to visit with both for the purposes of assessing and meeting their needs; determining and implementing a permanency plan; supervising, supporting and assuring the stability of the child's placement; and assuring a safe, adequate and well-planned exit from foster care. A DCS case manager shall be assigned to every case. If a private provider is engaged in the case, the DCS and private provider case managers shall collaborate to ensure compliance with this agreement.

**MAINTENANCE.**

Any DCS case manager responsible for the case of at least one class member, and private provider staff with comparable responsibilities, shall not have case responsibility for more than:

- 15 individual children in DCS custody if the case manager is a case manager I;
- 20 individual children in DCS custody if the case manager is a case manager II or III with no supervisory responsibility; and
- 10 individual children in DCS custody if the case manager III supervises one or two lower level case managers.

**MAINTENANCE.**

If DCS decides to propose the use of workers carrying a mix of custodial and non-custodial cases, a weighted equivalent caseload standard will be determined in consultation with the TAC.

K.    Supervision by DCS case managers responsible for cases of any class member and private provider staff with comparable responsibilities shall be as follows:

- A case manager IV or team coordinator may supervise up to 5 lower level case managers and shall not carry their own caseloads; and
- A case manager III may supervise up to 4 lower level case managers.

**MAINTENANCE.**

A case manager III can only be given supervisory responsibility in circumstances in which the caps on supervisory caseloads dictate that an additional case manager IV would have less than a full supervisory case load. No case manager III supervising more than 2 lower level case managers can have a caseload.

**MAINTENANCE.**

L.    When a case manager leaves the agency, his or her cases shall be reassigned within one business day. No cases shall be uncovered at any time. Except in documented emergency situations, or when the case manager leaves without prior

notice, all transfers of cases between case managers shall take place after a face-to-face meeting, including the departing and the receiving case managers' supervisors, to discuss the case. The departing case manager shall make every effort to introduce the receiving case manager, in person, to the child and the child's parents.

M.  Any region with an annual case worker turnover rate that exceeds 10% in which cases are either uncovered or are being reassigned to workers at the caseload cap, shall maintain a pool of trained workers to assume the caseloads of departing workers.

**MAINTENANCE.**

N.  All documentation of contacts or developments in a child's case shall be added to the child's case file within 30 days. **MAINTENANCE.** The case files of class members shall contain adequate documentation of the services provided, progress, placement changes, and authorizations of approval for placements, treatment and services.

O.  Any other child care workers employed by any child care facility or private provider shall have a minimum of a high school diploma, with preference given to those applicants with one year of previous child welfare-related experience.

**MAINTENANCE.**

VI. PLACEMENT AND SUPERVISION OF CHILDREN

A.  Placement Standards and Exceptions

1.  All children shall be placed according to the following standards:

a.  All children shall be placed within their own region or within a 75-mile radius of the home from which the child entered custody, unless (a) the child's needs are so exceptional that they cannot be met by a family or facility within the region, (b) the child needs re-placement and the child's permanency goal is to be returned to his parents who at that time reside out of the region, or (c) the child is to be placed with a relative out of the region.

**MAINTENANCE.**

b.  Children shall not remain in any emergency or temporary facility, including but not limited to emergency shelters, for more than 30 days. Children shall not be placed in more than one such facility within any 12 month period. An exception to the multiple placement limit within any 12-month period may be made (a) for an individual placement episode for a maximum of 5 days for

12

runaways and children facing a direct threat to their safety, or who are a threat to the safety of others, where immediate removal is necessary, or (b) for a single additional placement in a primary treatment center (PTC) for up to a maximum of 15 days, if a child's behavior has changed so significantly that placement for the purposes of assessment is critical for the determination of an appropriate placement.

**MAINTENANCE.**

c.   Siblings who enter placement at or near the same time shall be placed together, unless (a) doing so is harmful to one or more of the siblings, (b) one of the siblings has such exceptional needs that can only be met in a specialized program or facility, or (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. These efforts will be documented and maintained in the case file.

**MAINTENANCE.**

d.   No child shall be placed in a resource home if that placement will result in (a) more than three foster children in the home, (b) more than six children, including the resource family's natural and/or adopted children, in the home, or (c) more than 3 children under the age of 3 in the home; unless either (a) such placement is in the best interests of all the foster children in the home, or (b) the child is part of a sibling group and there are no other children in the home.

e.   No child under six years of age shall be placed in a placement other than a resource home unless the child has exceptional needs which cannot be met in a resource home but which can be met by the congregate care facility in which the child is placed.

**MAINTENANCE.**

f.   No child shall be placed in a residential treatment center or any other group care setting with a capacity in excess of eight children unless (a) the child's needs can be met in that specific facility and (b) that facility is the least restrictive placement that could meet the child's needs.

g.   No child in DCS physical or legal custody in foster care shall be placed, by DCS or with knowledge of DCS, in a jail, correctional or detention facility unless such child has been charged with a

delinquency charge or unless otherwise placed or ordered by the court. DCS shall work with law enforcement and court officials to ensure that DCS is immediately notified of any child in DCS legal custody who has been placed in a jail, correctional or detention facility.

**MAINTENANCE.**

h. DCS shall not place any child determined by a DCS assessment to be at high risk for perpetrating violence or sexual assault in any foster care placement with foster children not so determined.

i. Children for whom the permanency goal is adoption should, whenever possible, be placed with a family in which adoption is a possibility.

**MAINTENANCE.**

j. DCS shall only contract for placements or services with licensed contractors or subcontractors.

**MAINTENANCE.**

2. For provisions VI.A.1.a., b., c., d., e., and f. above, if DCS approves a placement that does not meet the applicable standard, the Regional Administrator shall either:

a. Indicate that the placement meets one of the permissible exceptions under the standards and, if so, ensure that the facts supporting that exception are documented in the case file; or

b. Indicate that the placement does not meet one of the permissible exceptions, document the reasons that the placement was nevertheless approved, and indicate any further action to be taken with respect to that placement.

3. The quality assurance division, using aggregate data and case reviews, shall be responsible for tracking, reporting, and ensuring that appropriate action is taken with respect to placements that do not comply with the placement standards in Section VI.A.1.

B. All children in DCS custody shall receive an assessment, including a medical evaluation and, if indicated, a psychological evaluation, using a standardized assessment protocol. **MAINTENANCE.** The assessment may take place prior to custody, but no later than 30 days after the child comes into custody. As soon as the assessment is completed, the child's placement shall be reevaluated to ensure

that it meets the child's needs.

C.  All class members shall have access to a reasonable and appropriate education, including special education services, the need for which shall be timely identified. Children shall be placed in community schools whenever possible. **MAINTENANCE.** DCS shall assign a full time educational specialist in each region, and twelve regional lawyers with special expertise in educational issues, to ensure that individual children in DCS custody have access to a reasonable and appropriate education, including special education services, the need for which shall be timely identified. **MAINTENANCE.**

D.  Psychotropic medication shall not be used as a method of discipline or control of a child. When possible, parental consent shall be obtained for the use of medically necessary psychotropic medication. If a parent is unavailable to provide consent, the regional health unit nurse shall review and consent to medically necessary psychotropic medication. Regional health unit nurses shall ensure that each of their consents is appropriately recorded, whether a child is placed in a DCS placement or through a private provider. The Medical Director shall oversee and ensure compliance with the Department's policies regarding psychotropic medications.

E.  An appropriately qualified Medical Director shall be responsible for revising, updating, and monitoring the implementation of policies and procedures surrounding all forms and uses of physical restraint and isolation/seclusion of class members, and shall be authorized to impose corrective actions. All uses of physical restraint in any placement, and all uses of isolation/seclusion in group, residential, or institutional placements, shall be reported to and reviewed by the quality assurance division and made available to the licensing unit and the Medical Director for appropriate action.

**MAINTENANCE.**

F.  DCS shall have a full range of independent living services and shall provide sufficient resources to provide independent living services to all children in the plaintiff class who qualify for them.

G.  DCS will maintain a child placement and private provider division within its Central Office. **MAINTENANCE.** This division will provide consultation and technical assistance to regional staff on placement issues so that regional placement support units are able to carefully and appropriately match the child's individual needs to a placement facility or foster family. **MAINTENANCE.** DCS will maintain regional placement units with sufficient staff, automated information and tracking capabilities, and other resources to ensure that all children requiring placement are placed promptly, appropriately, and in accordance with their needs.

H.     All children in the plaintiff class shall receive visits from the DCS case manager responsible for their case, whether the child is placed through a program directly run by DCS or through a private provider, as follows:

1.     For children in DCS foster homes, worker-child visiting shall mean a face-to-face visit between the child's DCS case manager and the child. Visits may take place in the child's placement, at school if the child is of school age, in the case manager's office, or in another appropriate setting. Visits shall be made as frequently as is necessary to assure the child's adjustment to the placement, to ensure the child is receiving appropriate treatment and services, and to determine whether the child's needs are being met and service goals are being implemented. All visits shall include a private meeting between the case manager and the child out of the presence of the foster parents or other caregiver, except when the child is an infant. There shall be at least 6 face-to-face visits during the first two months after a child's entrance into custody, and at least 3 of these visits shall take place in the child's placement. Following the first two months after a child's entrance into custody, there shall be at least 2 face-to-face visits each month. One of these two face-to-face visits must take place in the caregiver's home.

2.     For children in a foster home or facility operated by a private provider:

    a.     Private provider case worker: DCS shall require and ensure that the private provider case worker visits the child as frequently as necessary to ensure the child's adjustment in placement, to ensure the child is receiving appropriate treatment and services, and to determine that the child's needs are being met and service goals are being implemented. Visits may take place in the child's placement, at school if the child is of school age, in the case manager's office, or in another appropriate setting. Worker-child visiting shall mean a face-to-face visit between the child's private agency case worker and the child. All visits shall include a private meeting between the private provider case worker and the child out of the presence of the foster parents or other caregiver, except when the child is an infant. There shall be at least 6 face-to-face visits during the first two months after a child's entrance into custody in a foster home or facility operated by or under a private contract agency, and at least 3 of these visits shall take place in the child's placement. Following the first two months after a child's entrance into custody, there shall be at least 2 face-to-face visits each month. One of these two face-to-face visits must take place in the caregiver's home.

    b.     DCS case manager: The DCS case manager shall visit each child in a foster home or facility operated by a private provider as

frequently as necessary to ensure the child's adjustment to the placement, to ensure the child is receiving appropriate treatment and services, and to determine that the child's needs are being met and service goals are being implemented, but at least once each month. Worker-child visiting shall mean a face-to-face visit between the child's DCS case manager and the child in the child's placement and, except when the child is an infant, shall include a private meeting between the DCS case manager and the child outside the presence of the foster parents or other caregiver, the facility staff and the private provider case worker. The private provider worker and DCS case manager shall meet face-to-face at least once every three months in order to have substantial discussions with each other, the foster parent(s) or other caretaker, and the child, if age appropriate.

## VII. PLANNING FOR CHILDREN: MINIMUM STANDARDS FOR ALL CHILDREN AND YOUTH

A.  DCS shall maintain and update policies and procedures that establish a best practices planning process, as set forth in the Principles of this agreement, for all foster children in DCS custody.

    **MAINTENANCE.**

B.  A trained, full-time or back-up facilitator shall participate in every Initial CFTM and Placement Stability CFTM. The following persons shall be Child and Family Team members as appropriate: (1) private provider agency worker; (2) guardian ad litem (GAL); (3) court appointed special advocate (CASA); (4) resource parents; and (5) the child's parents or other relatives or fictive kin. DCS shall provide reasonable advance notice of CFTMs to the GAL and CASA worker. Any child 12 years old or older shall participate in the meeting, unless extraordinary circumstances exist, and are documented in the case record, as to why the child's participation would be contrary to his or her best interests.

C.  The Department shall begin the process of building a team, assessing, and convening a formal meeting prior to children entering state custody, except when an emergency removal is warranted. In the case of an emergency removal, an Initial CFTM shall be convened no later than seven (7) days after a child enters state custody. Efforts to ensure the parents' participation shall include providing transportation and/or child care and/or a brief rescheduling, and shall be documented in the child's case file.

D.  The Initial Permanency Planning CFTM shall occur within thirty (30) calendar days of a child entering custody. If the parents cannot be located or refuse to meet with the worker, the DCS case manager shall document all efforts made to locate the parents and to ensure that the meeting takes place. All services documented in

the record as necessary for the achievement of the permanency goal shall be provided within the time period in which they are needed. Within sixty (60) calendar days of a child entering custody, an individualized, completed and signed permanency plan for that child must be presented to the court. Biological parents shall have the meaningful opportunity to review and sign a completed handwritten or typewritten plan at the conclusion of the Initial Permanency Planning CFTM or before the plan is submitted to the court.

E.    The Department shall convene a Placement Stability CFTM prior to any child or youth potentially disrupting from a placement while in state custody, or, in the event of an emergency change in placement, as soon as team members can be convened, but in no event later than fifteen (15) days before or after the placement change.

F.    The DCS supervisor assigned to the case shall participate in the Initial CFTM, the Initial Permanency Planning CFTM, and the Discharge Planning CFTM. At minimum, the supervisor will participate in one CFTM every six months for each child on their supervisory caseload. For all other CFTMs, the supervisor shall make a decision about his or her participation based on the complexity of the case; the availability of other supports, such as a full-time or skilled facilitator; and the case manager's experience. DCS shall develop a process for supervisors to review, monitor and validate the results of CFTMs to ensure supervisors remain engaged and responsible for quality casework.

G.    No child shall be assigned a permanency goal of Planned Permanent Living Arrangement (PPLA) unless it is consistent with the January 2008 PPLA Protocol.

**MAINTENANCE.**

H.    Independent living is no longer used, and shall not be used, as a permanency goal, but rather is used as a service array to enable older youth to transition into independent adult life.

**MAINTENANCE.**

I.    Children with an initial goal of return home may also have another concurrently planned permanency goal. Record keeping and tracking for any child in the class with more than one concurrently planned permanency goal shall be consistent with a goal of return home until return home is no longer an option.

**MAINTENANCE.**

J.    The child's DCS case manager and his or her supervisor shall have an ongoing responsibility to assure that the child's permanency goal is appropriate or to change it if it is not, to assure that the child's services and placement are appropriate and are meeting the child's specific needs, to assure that the parents

and other appropriate family members are receiving the specific services mandated by the permanency plan and that they are progressing toward the specific objectives identified in the plan, and to assure that any private service providers identified in the plan or with whom the child is in placement are delivering appropriate services.

K.      Whenever the Permanency Plan goal needs to be revised a CFTM shall be convened. The child's permanency plan shall be reviewed and updated at CFTMs at least every three months. These meetings must be separate and distinct from any court hearings, foster care review board meetings or other judicial or administrative reviews of the child's permanency plan.

L.      DCS shall recommend to the Juvenile Court a 90-day trial home visit for all children for whom a decision is made to return home or to be placed in the custody of a relative, before the child or youth is projected to exit state custody. An exception to this general rule shall be allowed, based on specific findings and the signed certification of the case manager, supervisor and regional administrator for the child, that a shorter trial home visit of no less than 30 days is appropriate to ensure the specific safety and well-being issues involved in the child's case.

M.      A Discharge Planning CFTM shall be convened within thirty (30) days of a child returning home on trial home visit, exiting custody to a newly created permanent family, or aging out of the system. If exiting custody is determined to be inappropriate, DCS shall make the appropriate application to extend the child's placement in the custody of DCS before the expiration of the trial home visit. Participants in the Discharge Planning CFTM will identify all of the services necessary to address the issues that required removal, to assure the child's continued safety, and to support the child or youth and family and the trial home visit. During any trial home visit, the child's case manager shall visit the child in person at least 3 times in the first month, and twice per month for any remainder of the trial home visit period ordered by the court, and each visit shall occur outside the parent or other caretaker's presence. The case manager shall also contact service providers, and shall visit the school of all school age children at least once each month during the trial home visit period, shall interview the child's teacher, and ascertain the child's progress in school and whether the school placement is appropriate.

VIII.   FREEING A CHILD FOR ADOPTION

A.      The process of freeing a child for adoption and seeking and securing an adoptive placement shall begin as soon as adoption becomes the child's permanency goal but in no event later than as required by federal law. The adoption process shall begin immediately for all children for whom a diligent search has failed to locate either parent and for whom no appropriate family member is available to assume custody.

B.     DCS has replaced its process for making legal risk placements with policies and procedures for the "dual licensing" of resource families as foster parents and adoptive parents.

**MAINTENANCE.**

C.     DILIGENT SEARCHES AND CASE REVIEW TIMELINE

1.     Diligent searches for parents and relatives of a child placed in state custody shall be conducted and documented according to DCS policy by the DCS case manager prior to the child coming into custody if possible but no later than 30 days after the child comes into custody, and thereafter as needed, but at least within three (3) months from when a child enters custody and again within six (6) months from when a child enters custody.

2.     When parents have been indicated for severe abuse, a discussion with the DCS attorney shall take place within 45 days regarding whether to immediately seek to terminate parental rights. The decision shall be documented in the child's case record.

3.     Within nine (9) months of a child entering state custody, the permanency plans shall be reviewed with the DCS attorney to accomplish the following:

a.     If the child is to return home or be placed in the custody of a relative, a timetable for unsupervised visits, trial home visits and hearings to be returned to the parent/relative shall be established.

b.     If the child is not returning home, a timetable for providing documentation and information to the DCS attorney shall be established in order to file a termination of parental rights petition.

c.     If the decision to file a TPR has been made, and the child is not in a pre-adoptive home, the case manager along with the members of the Child and Family Team shall continue to search for relatives as placement options.

4.     If return home or other permanent placement out of custody (relative or guardianship) without TPR is inappropriate at both 12 and 15 months, a TPR petition shall be filed no later than 15 months after the child is placed in DCS custody, unless there are compelling reasons, which shall be documented on the child's case file, for not doing so.

**MAINTENANCE.**

5. The following series of time frames related to critical activities in the adoption process shall be followed as set forth in DCS policy:

   a. Within 90 days of the permanency goal changing to adoption, the DCS attorney shall file the petition to terminate parental rights, unless there is a legal impediment, in which case the petition shall be filed as soon as possible once the legal impediment is resolved.

   **MAINTENANCE.**

   b. DCS shall take all reasonable steps to ensure that the date of the trial court order granting full guardianship shall be within eight (8) months of the filing of the TPR.

   c. DCS shall take all reasonable steps to ensure that the date of the finalization of the adoption or transfer to permanent guardianship shall be within twelve (12) months of full guardianship.

   **MAINTENANCE.**

   d. All children who have been in custody for 15 months or more with no TPR petition filed shall be reviewed by the Commissioner or his or her designee.

   **MAINTENANCE.**

6. A resource parent who has been providing appropriate foster care for a child for 12 months shall have a preference as an adoptive parent for that child, should the child become legally available for adoption.

   **MAINTENANCE.**

D. FINDING OUR CHILDREN UNCONDITIONAL SUPPORTS (FOCUS) TEAMS

   1. The FOCUS Team will ensure that all children or youth entering full guardianship each month will be reviewed to determine whether or not these children or youth have a permanent family identified and that the needed supports and services are in place to ensure timely permanency.

   2. If there is a permanent family identified for the child, there will be an assessment regarding any barriers to permanency. If there are identified barriers to permanency, appropriate referrals will be made to the regions or private provider agency or agencies as may be needed and appropriate. Children and youth with an identified permanent family will be reviewed

monthly to assess whether the identified permanent family is still a viable permanency option.

3. For children and youth without permanent families identified, the following steps will be taken to ensure timely permanency:

   a. The Child and Family Team will ensure the development and implementation of the child or youth's Individualized Recruitment Plan, which will include time frames, roles, and responsibilities;

   b. The Child and Family Team will ensure that the child or youth is registered on ADOPT US Kids to help match the child or youth with potential families;

   c. The Child and Family Team will ensure the use of archeological digs, family searches, interviews and other options to build a team of informal and formal supports to assist in finding permanency.

4. The FOCUS Team will monitor case progress, provide tracking and outcome data to measure the effectiveness of the FOCUS process in moving children and youth toward permanency, and use aggregate and qualitative data to report on trends that promote and prevent timely permanency for children. This will include reporting and analysis on those children and youth disrupting from placements while in full guardianship.

E. DCS shall maintain a system of adoption subsidies and post-adoptive services and provide notice of and facilitate access to those services at the earliest possible time to all potential adoptive families and resource families.

**MAINTENANCE.**

IX. RESOURCE PARENT RECRUITMENT, RETENTION, AND APPROVAL

A. DCS shall establish and maintain a statewide, regional and local program of resource parent recruitment. Under Tennessee's dual approval process, both foster and adoptive parents are considered to be resource parents. DCS will ensure the availability of a toll-free phone number in all regions of the state to provide information concerning the availability of adoption information, training, the approval process and children available for adoption.

**MAINTENANCE.**

B.  DCS will develop and maintain standards to approve only appropriate resource families. All such approvals will be handled within the regions or by private provider agencies, which shall be adequately staffed and trained.

    1.  All inquiries from prospective resource parents shall be responded to within 7 days after receipt.

    2.  Home studies shall be completed within 90 days of completing the approved training curriculum, unless the applicant defaults or refuses to cooperate.

    3.  Identified staff persons will conduct exit interviews with all resource families who voluntarily resign as resource parents, and DCS shall issue annual reports on why resource families leave DCS and what steps are necessary to ensure their retention.

    4.  To the extent possible, DCS shall maintain a practice of using existing resource families to recruit and retain new resource families, and shall maintain a statewide and regional support system for resource families.

    5.  DCS shall provide adequate and appropriate respite services on a regional basis to resource parents with special needs children.

    **MAINTENANCE.**

C.  All resource parent room and board rates (including rates for DCS resource parents, private provider resource parents and certified relatives and kin) will at a minimum meet USDA standard and will be adjusted annually to be no lower than USDA standards for the cost of raising children within this region.

**MAINTENANCE.**

D.  DCS shall provide specialized rates for DCS and private provider resource parents providing services to special needs children. **MAINTENANCE.** DCS shall supply and shall ensure that private providers supply any specialized training necessary for the care of special needs children. DCS also will continue to contract with private providers for medically fragile and therapeutic foster care services. **MAINTENANCE.**

E.  DCS shall schedule resource parent training classes, including individual training as needed, every thirty days in every region at times convenient to prospective resource parents, who shall not receive placement of a child until completing such training. **MAINTENANCE.** DCS may waive resource parent approval requirements for relatives and kin after completing a home visit and local criminal records check, but relatives and kin must complete all remaining approval requirements within 150 days of placement.

F.   DCS shall ensure that the pool of resource families is proportionate to the race and ethnicity of the children and families for whom DCS provides placement and services, provided however that individual children shall be placed in resource families without regard to race or ethnicity.

**MAINTENANCE.**

X.   STATEWIDE INFORMATION SYSTEM

A.   DCS shall establish and maintain a statewide computerized information system for all children in DCS custody that is accessible in all regional offices and into which workers shall be able to directly enter data. **MAINTENANCE.** The statewide computerized information system shall ensure data integrity and user accountability. The system shall have the necessary controls to prevent the duplication of data and to reduce the risk of incorrect or invalid data.

B.   This system shall include uniform data presentation, including but not limited to AFCARS elements from DCS for all children in the plaintiff class. This system shall be audited periodically to ensure the accuracy and validity of the data. This system shall provide an immediately visible "audit trail" to the data base administrators of all information entered, added, deleted or modified, and shall have necessary security to protect data integrity. This system shall be capable of providing system-wide reports.

C.   An intensive data clean-up process shall ensure the accuracy of all data, including but not limited to data on all individual children in the plaintiff class, in the statewide computerized information system.

XI.  QUALITY ASSURANCE

A.   DCS shall maintain a statewide quality assurance program, which shall be directed by a quality assurance division. The quality assurance division shall assure that, in addition to external case file reviews and monitoring, there is an internal method to perform special administrative case record reviews. The quality assurance division shall track, coordinate, and integrate all DCS quality assurance activities. The quality assurance division shall provide critical attention to the follow-up needed to improve services and outcomes.

**MAINTENANCE.**

B.   This division shall provide regular reports and shall also conduct specialized case record reviews on issues relevant to this agreement and other issues affecting the care of children.

**MAINTENANCE.**

24

C.    The division shall be adequately staffed and shall receive special training to fulfill its responsibilities.

**MAINTENANCE.**

D.    At a minimum, the quality assurance division shall, once every 12 months, review a statistically significant number of cases from each region. These case file reviews shall include interviews and an independent assessment of the status of children in the plaintiff class. As part of this annual review, the quality assurance division, central office, and other designated staff shall develop a measure of appropriate and professional decision-making concerning the care, protection, supervision, planning and provision of services and permanency for children in the class. This measure shall be utilized in conjunction with the case file reviews to measure DCS's performance.

**MAINTENANCE.**

E.    The quality assurance division, utilizing aggregate data and case reviews as appropriate, shall be responsible for tracking, reporting and ensuring that appropriate action is taken with respect to the following categories of cases:

1.    Children who have experienced three different placements, excluding a return home, within the preceding 12 months.

2.    All cases in which a child has been in more than two shelters or other emergency or temporary placements within the past 12 months, and in all

cases in which a child has been in a shelter or other emergency or temporary placement for more than 30 days.

3.    Children with a permanency goal of return home that has remained in effect for more that 24 months.

4.    Children who have returned home and reentered care more than twice and have a permanency goal to return to that home.

5.    Children with a sole permanency goal of adoption for more than 12 months for whom a petition to terminate parental rights has not been filed.

**MAINTENANCE.**

6. Children with a sole permanency goal of adoption for more than one year who have not been placed in an adoptive home.

   **MAINTENANCE.**

7. Children more than 60 days in custody who do not have a permanency plan.

8. Children for whom the permanency goal has not been updated for more than 12 months.

   **MAINTENANCE.**

9. Children who have been in custody for 15 months or more with no TPR petition filed.

   **MAINTENANCE.**

F. DCS shall implement the recommendations in the Racial Disparity Report set forth in the implementation plan approved by the Court on August 19, 2004.

   **MAINTENANCE.**

G. The TAC will continue to report on the status of all foster children in DCS custody who entered DCS custody prior to October 1, 1998.

   **MAINTENANCE.**

XII. SUPERVISION OF PRIVATE PROVIDER AGENCIES

A. All private providers which provide placements or services to class members shall only do so pursuant to annual performance-based contracts.

   **MAINTENANCE.**

B. DCS shall only contract with those private providers that meet the provisions of this agreement that specifically apply to those agencies and that meet state standards governing the operation of child care facilities. These state standards shall reflect reasonable professional standards. DCS shall not contract with any private provider that has not been licensed by the State to provide placements for children in the plaintiff class.

   **MAINTENANCE.**

C.  DCS shall not contract and shall immediately cease contracting with any program or private provider that gives placement preference by race, ethnicity, or religion.

**MAINTENANCE.**

D.  Any agency or private provider contracting with DCS shall be prohibited from refusing to accept a child referred by DCS as appropriate for the particular placement or program.

**MAINTENANCE.**

E.  DCS shall maintain sufficient staff to allow for appropriate monitoring and oversight of private providers. All private providers supplying placements for children in the plaintiff class shall be inspected annually by DCS staff with relevant provider monitoring and oversight responsibilities in an unannounced visit and DCS shall determine in a written report whether the private provider complies with state licensing standards. The units responsible for the various aspects of private provider monitoring and oversight, including the licensing unit, shall collaborate with the DCS quality assurance division and the central office division responsible for child placement and private provider contracts to determine agency compliance with the terms of this agreement.

F.  DCS shall not contract with any private provider, for which any owner, member of the board of directors, or member of the board of trustees also holds any other position that may influence the placements of class members. Such positions include, but are not limited to, juvenile court judges, magistrates, or other court officers. All future contracts or contract renewals shall contain this policy as a binding term of the contract.

XIII.  FINANCIAL DEVELOPMENT

A.  DCS shall develop and implement policies and procedures to maximize funding through Titles IV-B and IV-E of the Adoption Assistance and Child Welfare Act of 1980.

**MAINTENANCE.**

B.  All funds remitted for children in the plaintiff class to the State of Tennessee by the United States Department of Health and Human Services, as described above, shall be committed exclusively to the provision of services and staff serving class members. It is the intent of the state that dollars committed to DCS for the provision of services and resources to benefit children in the class and children at risk of entering the class shall not be decreased if efforts to maximize federal

dollars result in additional federal funding. Nothing in this provision shall reduce the defendants' financial obligations to comply with the terms of this agreement.

**MAINTENANCE.**

C.    DCS shall maintain an appropriate financial management system capable of ensuring timely and accurate payments to family foster homes, adoptive homes, and private providers.

XIV.   TECHNICAL ASSISTANCE COMMITTEE

A.    A technical assistance committee ("TAC") of no fewer than two and no more than four neutral experts in the child welfare field has been selected to assist the state to implement this agreement. The TAC shall be comprised of Judith Meltzer, Andrew Shookhoff, Paul Vincent and Steven D. Cohen. Should any of the TAC members become unavailable, the remaining TAC members will be authorized, but not required, to select replacements. Appointment of additional TAC members shall require the consent of the parties.

B.    The TAC is to advise DCS on the child welfare policy, management and practice issues delineated in this agreement, as well as other issues which DCS or the TAC agree to consult on, and as set forth in Section XV, act as Monitor.

XV.   MONITORING

A.    The TAC shall continue in the role of independent Monitor that will evaluate, monitor and report on performance under the terms of this agreement until this Court's jurisdiction terminates as described in Section XVIII.D. The TAC shall issue reports on performance under this agreement for the twelve-month period from January 1, 2010, through and including December 31, 2010, and for each six-month period thereafter. To inform its reports, the TAC will look first to existing DCS data and reports, and Defendants will provide the TAC all requested information and access to staff within DCS and the Executive Branch as the TAC deems necessary. The TAC is authorized to require DCS to create new reports on the status of implementation of and compliance with this agreement. The TAC shall continue to report on all subject areas that it has previously reported on in this action. The TAC agrees to respect the confidentiality of any documents that are in draft form or are otherwise privileged.

B.    Plaintiffs shall have access from the TAC to all information made available to the TAC, and to all other information necessary to ensure compliance and enforcement of this agreement. If Plaintiffs become aware of information related to possible non-compliance that they wish to investigate, Plaintiffs shall notify the TAC, without any limitation to Plaintiffs' right to access all information necessary to ensure compliance and enforcement of this agreement. Plaintiffs shall not

initiate case file reviews unless necessary in connection with a motion for non-compliance or enforcement.

C.    Defendants shall continue to fund the TAC's monitoring and technical assistance functions. The TAC shall exercise final authority over its use and expenditure of monitoring and technical assistance funding.

D.    The TAC, in consultation with the parties, shall determine and describe in each report the specific methodologies, which may include a combination of longitudinal and point-in-time data analysis, it has employed to meet it reporting requirements.

XVI.    OUTCOME AND PERFORMANCE MEASURES

A.    Child Welfare Outcomes

1.    Reunification

At least 80% of children entering care who are reunified with their parents or caregivers at the time of discharge from custody shall be reunified within 12 months of the latest removal date.

**MAINTENANCE.**

Of the remaining children, 75% shall be reunified within 24 months of the latest removal date.

**MAINTENANCE.**

2.    Adoption Finalization

At least 75% of children in full guardianship shall have their adoption finalized or permanent guardianship transferred within 12 months of full guardianship.

**MAINTENANCE.**

3.    Number of placements

At least 90% of children in care shall have had two or fewer placements within the previous 12 months in custody, not including temporary breaks in placement for children who run away or require hospitalization and return to the same placement.

**MAINTENANCE.**

At least 85% of children in care shall have had two or fewer placements within the previous 24 months in custody, not including temporary breaks in placement for children who run away or require hospitalization and return to the same placement.

**MAINTENANCE.**

4.  Length of time in placement.

At least 75% of the children in placement who entered after October 1, 1998, shall have been in placement for two years or less.

**MAINTENANCE.**

No more than 17% of the children in placement shall have been in placement for between two and three years.

**MAINTENANCE.**

No more than 8% of the children in placement shall have been in placement for more than three years.

**MAINTENANCE.**

5.  Reentry into placement

No more than 5% of children who enter care shall reenter within 1 year after a previous discharge.

6.  Achievement measures upon discharge

At least 90% of the children who are discharged from foster care (excluding children on runaway) because they reached the age of 18 shall have at least one of the following apply at the time of discharge: earned a GED; graduated from high school; enrolled in high school, college, alternative approved educational program for special needs children, vocational training; or be employed full time.

B.  Performance Indicators / Practice.

1.  Parent-child visiting

a.  The standard: For children in the plaintiff class with a goal of reunification, parent-child visiting shall mean a face-to-face visit with one or both parents and the child which shall take place for no

less than one hour each time (unless the visit is shortened to protect the safety or well-being of the child as documented in the child's case record). The visit shall take place in the child's home if possible or in as homelike a setting as possible, or for longer as otherwise required by the child's permanency plan and reasonable professional standards. This standard does not apply to situations in which there is a court order prohibiting visitation or limiting visitation to less frequently than once every month. The child's case manager may consider the wishes of a child (generally older adolescents) and document in the case file any deviation from usual visitation requirements.

b.      At least 50% of all class members with a goal of reunification shall be visited face-to-face by one or both parents at least twice per month for at least one hour in as home-like a setting as possible, unless there is a court order to the contrary or the case manager has considered and documented the wishes of a child to deviate from this requirement.

c.      For the remaining class members with a goal of reunification who are not visited twice per month, at least 60% shall be visited once a month in keeping with the standards of the preceding paragraph.

2.   Placing siblings together

At least 85% of all siblings who entered placement during the reporting period shall be placed together, unless doing so is harmful to at least one of the siblings; a sibling has exceptional needs requiring placement in a specialized program or facility; or the size of a sibling group makes such placement impracticable despite diligent efforts to place the group together, in which event the case manager shall document immediate efforts to locate a suitable home in which to reunite the siblings.

**MAINTENANCE.**

3.   Sibling visiting

a.      The standard: For children who are not placed in the same home or facility as their siblings there shall be face to face visits between the child and any of his or her sibling(s) who are in the plaintiff class in the most home-like setting available. The visits shall take place in the parent's home, the foster home in which one of the siblings is living, the home of a relative, or the most home-like setting otherwise available and shall occur as frequently as is necessary and appropriate to facilitate sibling relationships but no less frequently than once each month. The visiting shall take place

for no less than one hour each time (unless the visit is shortened to protect the safety or well-being of the child as documented in the child's case record), or more as otherwise required by the child's permanency plan and reasonable professional standards. Reasonable exceptions to the frequency requirement shall include cases in which: (1) there is a court order prohibiting visitation or limiting visitation to less frequently than once every month; (2) visits are not in the best interest of one or more of the siblings and the facts supporting that determination are documented in the case file; (3) the case manager for at least one of the siblings has considered the wishes of the sibling (generally older adolescents) and deviates from this standard based on the child's wishes; or (4) a sibling is placed out of state in compliance with the Interstate Compact on the Placement of Children and there is documentation of reasonable efforts by DCS to maintain sibling contact between in-state and out of state siblings, including consideration of placement near border states and efforts to arrange visits and for contact by telephone or other means. All exceptions, and all reasonable steps to be taken to assure that visits take place and contact is maintained, shall be documented in the case file.

b. At least 90% of all children in the class in placement who have siblings with whom they are not living shall visit with those siblings at least once a month during the reporting period at issue.

4. Filing a petition to terminate parental rights

At least 70% of children in the class with a sole permanency goal of adoption during the reporting period shall have a petition to terminate parental rights filed within three months of the goal change to adoption.

**MAINTENANCE.**

Regardless of whether the Department meets or exceeds the standard in the preceding paragraph, 85% of all children with a sole permanency goal of adoption during the reporting period shall have a petition to terminate parental rights filed within 6 months of when the goal was changed to adoption.

**MAINTENANCE.**

5. Goal of Planned Permanent Living Arrangement

No more that 5% of children in the plaintiff class shall have a goal of Planned Permanent Living Arrangement.

**MAINTENANCE.**

6. In-region placements

   At least 85% of children in the class shall be placed within the region from which they entered placement or within a 75 mile radius of the home from which the child entered custody.

   **MAINTENANCE.**

## XVII. MODIFICATION

This agreement may be modified on the consent of the parties or upon appropriate motion filed with the court.

## XVIII. ENFORCEMENT, TERMINATION AND EXIT

A. General Principles Guiding Enforcement

   1. All of the provisions in this agreement are separately and independently enforceable. Plaintiffs agree not to seek judicial relief for isolated, technical, or de minimis violations of this agreement, or for violations relating solely to an individual child.

   2. Unless otherwise specifically stated, all provisions of this agreement shall apply to all children in the class, regardless of whether they are in a DCS or private provider placement, and regardless of the type of placement.

   3. Nothing in this agreement shall limit the right of the plaintiffs to seek from the court appropriate relief to remedy any violations of this agreement.

B. Dispute Resolution

   1. With regard to all provisions in this agreement, the following process shall apply:

      a. Prior to seeking judicial remedies for non-compliance, Plaintiffs shall notify the Defendants in writing if they believe Defendants are out of compliance with any provisions of this agreement.

      b. The parties shall engage in a 30-day period of good faith negotiations in an effort to resolve the non-compliance issues and shall use the TAC to facilitate this process.

      c. Plaintiffs may bypass the dispute resolution provisions of this agreement and seek immediate relief in court if Plaintiffs clearly demonstrate that DCS action or inaction in contravention of this

agreement caused or is likely to cause an immediate and substantial risk of serious harm to children in the class.

C.   Identification of "MAINTENANCE" Provisions

    1.   No later than thirty (30) days after the TAC issues each monitoring report pursuant to Section XV.A, the parties and the TAC shall meet and confer in an attempt to negotiate and agree upon which provisions in this agreement shall be identified as MAINTENANCE and which shall not. Such identification shall include keeping provisions previously identified as MAINTENANCE with that identification, removing the identification of MAINTENANCE from provisions that were previously identified as MAINTENANCE, and adding the identification of MAINTENANCE to provisions that were previously not identified as MAINTENANCE. The period of negotiation can be extended for one period of 10 days upon the consent of the parties.

    2.   If the identification of any provision(s) as MAINTENANCE (or not) remains in dispute, the parties shall refer the decision on such identification to the TAC, which shall issue its determination within thirty (30) days of the referral. The TAC's decision shall be final, binding, and unappealable by the parties.

    3.   Within ninety (90) days after the TAC issues each monitoring report pursuant to Section XV.A., the parties shall file with the court a proposed joint modification to this agreement that includes any revised identification of provisions as MAINTENANCE.

D.   Termination and Exit

    1.   This agreement shall remain in full force and effect until the court issues an order terminating jurisdiction over this action.

    2.   Once Defendants have achieved and simultaneously sustained MAINTENANCE status on all provisions in Sections II - XIII and XVI for a period of twelve (12) months, Defendants may request that the court issue an order terminating jurisdiction over all provisions of this agreement, except for Section XIX, by filing a Notice of Compliance and Proposed Order Terminating Jurisdiction with the court. If the Monitor's reports show the required achievement and sustained maintenance status, Plaintiffs may only oppose such Notice and Proposed Order in the extraordinary circumstance in which specific evidence establishes such a serious threat to the sustained functioning of DCS that continued jurisdiction is required in the interests of justice.

## XIX. EXTERNAL ACCOUNTABILITY REPORTING STRUCTURE

A. Defendants, with input from the TAC and Plaintiffs' counsel, shall develop an external accountability reporting center (the "Center"). Beginning in January of 2011, DCS will fund and the Center will build the capacity to report publicly on DCS's maintenance of program, policy and practice improvements under this agreement.

B. After the court terminates jurisdiction pursuant to Section XVIII.D over all provisions of this agreement except for this section, jurisdiction over this section shall continue for a period of eighteen (18) months.

C. Upon the court's termination of jurisdiction pursuant to Section XVIII.D, the Center will begin its public reporting which shall include, at a minimum, semi-annual reports on DCS performance under the terms of this agreement. DCS will provide the Center all data necessary to its function.

D. Defendants shall provide the financial resources required for the reasonable operation of the Center for a period of eighteen (18) months after the court terminates jurisdiction pursuant to Section XVIII.D of all provisions except this provision. Upon expiration of such eighteen (18) month period, Defendants shall file an unopposed Notice of Compliance with this Section XIX and a Proposed Order terminating jurisdiction over this Section.

## XX. ATTORNEYS FEES AND EXPENSES

As prevailing parties in this lawsuit, Plaintiffs are entitled to recover and reserve the right to seek reasonable attorneys fees and expenses up to the date of this agreement and for all subsequent activities in this lawsuit to the extent authorized pursuant to 42 U.S.C. §1988.


DATED: _____, 2011
          Nashville, TN


**SO ORDERED:**

Todd Campbell
_____
HONORABLE TODD J. CAMPBELL, U.S.D.J.

**APPROVED FOR ENTRY:**

**ATTORNEYS FOR PLAINTIFFS:**
/s/ Marcia Robinson Lowry
MARCIA ROBINSON LOWRY (*pro hac vice*)
IRA LUSTBADER (*pro hac vice*)
MELISSA COHEN (*pro hac vice*)
CHILDREN'S RIGHTS, INC.
330 Seventh Avenue, 4th Floor
New York, NY 10001
(212) 683-2210

/s/ David L. Raybin
DAVID L. RAYBIN (TN BPR #003385)
HOLLINS, RAYBIN AND WEISSMAN P.C.
Suite 2200, Fifth Third Center
424 Church Street
Nashville, TN 37219
(615) 256-6666

JACQUELINE B. DIXON (TN BPR #012054)
WEATHERLY, MCNALLY AND DIXON, P.L.C.
Suite 2260
424 Church Street
Nashville, TN 37219
(615) 986-3377

**OF COUNSEL FOR PLAINTIFFS**:
RICHARD B. FIELDS (TN BPR #4744)
688 Jefferson Avenue
Memphis, TN 38105
(901) 578-7709

ROBERT LOUIS HUTTON (TN BPR #15496)
Glankler Brown, PLLC
Suite 1700, One Commerce Square
Memphis, TN 38103
(901) 525-1322

WADE V. DAVIES (TN BPR #016052)
Ritchie, Dillard and Davies
606 W. Main Street, Suite 300
Knoxville, TN 37902
(865) 637-0661

**ATTORNEYS FOR DEFENDANTS:**

 /s/ Lindsey O. Appiah
LINDSEY O. APPIAH (TN BPR #027069)
Assistant Attorney General
General Civil Division
P.O. Box 20207
Nashville, TN 37202
(615) 741-7630