UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BRIAN A., et al. ) | |
| ) | |
| Plaintiffs, ) | Civ. Act. No. 3:00-0445 |
| ) | Judge Todd J. Campbell |
| v. ) | Magistrate Judge Joe B. Brown |
| ) | |
| BILL HASLAM, et al. ) | |
| ) | |
| Defendants. ) | |

# PLAINTIFFS' STATUS REPORT

1. By Order dated September 13, 2016, this Court granted the parties' Joint Motion to Reschedule Status Conference (Dkt. No. 564). The Court continued the Status Conference set for October 5, 2016, until November 18, 2016, at 2:00 p.m., and further directed that "[b]y November 1, the parties shall file written summaries of the status of the case." (Dkt. No. 565).

2. On April 4, 2016, the parties filed a Joint Stipulation Seeking Court Approval of the Proposed April 2016 Modified Settlement Agreement and Exit Plan (Dkt. No. 554 and 554-1, 554-2 and 554-3). The proposed April 2016 Modified Settlement Agreement and Exit Plan included modifications to the Outcome and Performance Measures in Section XVI.A.1 and modifications to the identification of provisions as MAINTENANCE. The proposed modifications were based upon the Monitoring Report of the Technical Assistance Committee ("TAC") dated February 8, 2016 ("February 2016 MR," Dkt. No. 552-1), negotiations between the parties, negotiations between the parties and the TAC, and the TAC Supplement to the February 2016 MR (Dkt. No. 554-1), dated April 4, 2016

1

("April 2016 MR Supplement"), which was created by the court-appointed monitors / TAC, pursuant to Section XV.A of the September 2015 MSA (Dkt No. 547).

3. Significantly, the proposed April 2016 Modified Settlement Agreement and Exit Plan reflected that Defendants had achieved MAINTENANCE status on all provisions in Sections II – XIII and XVI. As that MAINTENANCE status was based on the February 2016 MR and April 2016 MR Supplement, both of which analyzed performance using data through December 31, 2015, the parties further agreed for purposes of Section XVIII.D that Defendants achieved MAINTENANCE status with regard to all provisions in Sections II – XIII and XVI as of December 31, 2015.[1]

4. This Court granted the Joint Stipulation Seeking Court Approval of the Proposed April 2016 Modified Settlement Agreement and Exit Plan in all respects, and on April 11, 2016, separately filed and entered the April 2016 Modified Settlement Agreement and Exit Plan (Dkt. No. 555).

5. Subsequent to entry of the April 2016 Modified Settlement Agreement and Exit Plan, the parties and the monitors / TAC have continued to speak on a regular basis and to confidentially share data and performance information, including drafts of sections to be included in the "Maintenance Year" monitoring report (MR) that will be issued sometime after December 31, 2016, in addition to Plaintiffs' outreach to local stakeholders. The purpose of this activity is to assess whether performance is being maintained during the

---

[1] In addition to the MAINTENANCE status cited above, the proposed April 2016 Modified Settlement Agreement and Exit Plan reflected that the TAC and the parties evaluated compliance with the current Child Death Review protocol, effective January 1, 2015 (*see* Dkt. No. 552-1, at p. 94 n. 172), which had been the subject of multiple filings, stipulations and court appearances. *See, e.g.,* Dkt. No. 473, Jan. 25, 2013, Joint Stipulation Concerning Plaintiffs' Motion for Access to Information Regarding Child Fatalities Necessary to Ensure Compliance With the *Brian A.* Exit Plan; Dkt. No. 475, Jan. 28, 2013, at 51-54 (Hr'g Tr. Jan. 25, 2013); Dkt. No. 490-1, Apr. 25, 2013, Tennessee Department of Children's Services Child Death Response and Review; Dkt. No. 493, June 24, 2013, at 8-10 (Hr'g Tr. Apr. 29, 2013). Based on the 2016 Monitoring Reports, the parties also agreed, and requested approval, to identify the CDR process as in MAINTENANCE.

2016 hold year period and to allow rapid identification of any significant decline or concerns in performance. As of this Status Report, no such significant decline or concerns in performance have been identified.

6. At the request of the parties, the monitors / TAC issued a mid-year report, "Maintenance Year Status Report of the Technical Assistance Committee," filed on July 26, 2016 (Dkt. No. 562-1). The performance data in that report is briefly summarized below. Overall, the monitors / TAC found:

> In the six months that have passed since maintenance was achieved on all provisions . . . (as reflected in the April 11, 2016 order), the TAC has not found any basis for concern about the Department's performance in the areas that are key to sustaining maintenance. On the contrary, based on the range of ongoing activities that the TAC and TAC monitoring staff continued to be involved in, the TAC continues to be confident that the Department is maintaining the level of performance necessary to sustain "maintenance" and achieve exit from the lawsuit.

(Dkt. No. 562-1, at p. 5). In terms of the intent of the parties during this calendar "maintenance hold" year to increasingly shift lead responsibility for data collection and reporting from the monitors / TAC to the DCS quality assurance (QA) staff to ensure the Department has built sufficient internal quality assurance capacity, the monitors / TAC concluded they are "confident in the Department's capacity to support any of the TAC QA activities that continue to be of value after exit from Court jurisdiction." (Dkt. No. 562-1, at p. 5).[2]

7. Core findings in the mid-year report fall into four areas. First, the 2015-16 Quality Service Review (QSR) data demonstrate that the Department has "continued to maintain a level of performance…that is consistent with a reasonably well-performing child welfare

---

[2] However, the monitors / TAC note that they are "always sufficiently involved in data gathering activities to validate the monitoring data generated during the Maintenance Year and allow the TAC to rely on that data with confidence in its reporting." Importantly, "[t]he TAC continues to conduct the range of ongoing validation activities related to TFACTS reporting and functionality described in the April 2016 Supplemental Report; and the TAC continues to be involved in relevant case reviews, including the Quality Service Reviews (the annual qualitative assessment of the status of children in DCS custody and of system performance in core practice areas related to case planning and service provision)." Dkt. No. 562-1, at p. 6 & n. 1 and 2.

3

system."[3] The report also includes a breakdown of the QSR data by region.[4] Of note is improved performance (even from MAINTENANCE levels) on the QSR domain of the "Ongoing Assessment Process" from 74% to 80%, which informs the Department's performance on reevaluations of the child's placement on an ongoing basis after they enter foster care to make sure children are placed appropriately under Section VI.B; and improved performance on the QSR domain for "Successful Transitions" from 74% to 79%, which informs performance in maintaining community based services under Section IV.B. Plaintiffs also note some drop in performance for the "Family Connections" domain in the QSR from 78% to 71% (which provides a check on outcome measures for parent/child and sibling connections under Section XVI.B in the 2016 Modified Settlement Agreement and Exit Plan), although more complete data in the Maintenance Year monitoring report (MR) will be needed to fully assess performance and continued maintenance. Similarly, Plaintiffs note some drop in performance in the "Plan Implementation" domain in the QSR from 78% to 72% (which informs performance under the process requirements for child and family team meetings in Section VII.D.), although again, this requires more complete data in the Maintenance Year monitoring report (MR).[5]

8. Second, the mid-year report finds that updated case manager caseload and case manager workload data show maintenance of performance on this critical aspect of the 2016 Modified Settlement Agreement and Exit Plan, reflected in Section V.B: 90% of case manager I's, 98% of case manager II's or III's, and 96% of case manager III's are within mandated limits.[6] Additionally, between July 2015 and April 2016, 94-96% of case

---

[3] *Id.* at p. 7.
[4] *Id.* at pp. 26-38.
[5] *Id.* at p. 8.
[6] *Id.* at p. 11.

4

managers[7] and 96-98% of supervisory workload teams carrying at least one *Brian A.* case met the caseload and workload requirements.[8] The Special Investigations Unit (SIU) caseloads, moreover, have also remained within the Settlement Agreement standards.[9]

9.      Third, the mid-year report provides updated data on case manager face-to-face contacts with children, another critical component in ensuring the safety, well-being and permanency needs of class members (reflected in Section VI.H), and finds that "children in DCS custody continue to receive face-to-face contacts with sufficient frequency to meet the requirements of the Settlement Agreement."[10]

10.     Finally, the mid-year report discusses the current number of foster homes (referred to as "resource homes") and presents resource parent exit survey data from 2015. As of June 2016, there were a total of 4,747 homes (and 6,929 class members), compared to 4,716 (and 6,905 class members) in June 2015 and 4,816[11] (and 6,760 class members) in June 2014.[12] The exit survey for 2015 reflects the responses of 63.2%[13] of the families that voluntarily closed their homes between March and December 2015, a decrease from the 73% response rate included in the 2014 exit survey.[14] According to the 2015 exit survey data, "[o]nly 9.6% of resource parents surveyed indicated that they closed their home because they were dissatisfied with DCS support or policies," and only 7% rated their experience with DCS as unacceptable.[15] This compares to 11% who closed their homes

---

[7] *Id.* at p. 10.
[8] *Id.* at p. 13.
[9] *Id.* at p. 14.   The mid-year report does not include caseload information for child protective service (CPS) investigators, who are charged with investigating a subset of allegations of maltreatment of class members; however, data on this component will be included in the full Maintenance year monitoring report (MR).
[10] *Id.* at p. 16.
[11] *Id.* at pp. 6 and 23.
[12] Dkt. No. 545-1, at p. 29.
[13] Dkt. No. 562-1, at p. 23.
[14] Dkt. No. 535-1, at p. 87.
[15] Dkt. No. 562-1, at pp. 23-4.

5

due to dissatisfaction with DCS policies[16] and 10% rating their experience with DCS as unacceptable in the 2014 exit survey.[17] Additionally, the exit survey breaks out survey responses and identifies efforts at retention.[18] For example, it tracks the extent to which the families felt fully informed about the children being placed in their homes.[19]

11. In addition to the mid-year report , subsequent to entry of the April 2016 Modified Settlement Agreement and Exit Plan, the parties and the monitors / TAC have had several discussions concerning the creation of the External Accountability Reporting Structure under Section XIX of the April 2016 Modified Settlement Agreement and Exit Plan (Dkt. 555, at p. 36-7). Section XIX requires, upon this Court's termination of jurisdiction pursuant to Section XVII.D (should Defendants hold "MAINTENANCE" status for the full twelve months of 2016 and make the appropriate motion that is then granted by the Court), that an established External Accountability Center will provide public reporting with a minimum of "semi-annual reports on DCS performance under the terms of this agreement." (Dkt. No. 555, at p. 36, Section XIX.C).

12. DCS is required to "provide the Center all data necessary to its function" (Dkt. No. 555, at p. 36, Section XIX.C), and "Defendants shall provide the financial resources required for the reasonable operation of the Center" for those eighteen months. (Dkt. No. 555, at p. 36, Section XIX.D). Pursuant to Section XIX, the Court will retain jurisdiction for that period of eighteen (18) months (Dkt. No. 555, at p. 36-7, Section XIX.B and D). Upon the expiration of the eighteen month period, "Defendants shall file an unopposed

---

[16] Dkt. No. 535-1, at p. 87.
[17] Dkt. No. 535-1, at p. 125.
[18] Dkt. No. 562-1, at pp. 41-5.
[19] *Id.* at p. 43; Dkt. No. 535-1, at p. 125.

6

Notice of Compliance with this Section XIX and a Proposed Order terminating jurisdiction over this Section" and the entire action. (Dkt. No. 555, at p. 38, Section XIX.D).

13. The parties, with the assistance of the monitors / TAC, have agreed that the External Accountability Center will function in partnership with DCS, the Chapin Hall Center for Children at the University of Chicago[20] (which has been working in an advisory and consulting capacity with the parties and the TAC / monitors for years), and the Vanderbilt University Center of Excellence for Children in State Custody.[21] The parties, with the assistance of the monitors / TAC, are currently negotiating a reporting structure that identifies the provisions in the 2016 Modified Settlement Agreement and Exit Plan, how they will be assessed and tracked by the Department (allowing for changes in Department policy, specific linked references to Department policies and service availability, and changes in best practices and methodologies for measurement), and which provisions will be included in the public reports issued by the External Accountability Center. The staffing structure of the External Accountability Center is also being negotiated. The parties intend for the reporting and staffing structures for the External Accountability Center to be filed with the Court in advance of any hearing to address a request for termination of jurisdiction over items other than Section XIX.

---

[20] See http://www.chapinhall.org/.
[21] See https://medschool.vanderbilt.edu/coe/.

DATED: November 1, 2016
Nashville, TN


**APPROVED FOR ENTRY:**

**ATTORNEYS FOR PLAINTIFFS:**

 /s/ Ira Lustbader
IRA LUSTBADER (*pro hac vice*)
CHILDREN'S RIGHTS, INC.
88 Pine Street, Suite 800
New York, NY 10005
(212) 683-2210

 /s/ David L. Raybin
DAVID L. RAYBIN (TN BPR #003385)
HOLLINS, RAYBIN AND WEISSMAN P.C.
Suite 2200, Fifth Third Center
424 Church Street
Nashville, TN 37219
(615) 256-6666

JACQUELINE B. DIXON (TN BPR #012054)
WEATHERLY, MCNALLY AND DIXON, P.L.C.
Suite 2260
424 Church Street
Nashville, TN 37219
(615) 986-3377

**OF COUNSEL FOR PLAINTIFFS**:

ROBERT LOUIS HUTTON (TN BPR #15496)
GLANKLER BROWN, PLLC
Suite 1700, One Commerce Square
Memphis, TN 38103
(901) 525-1322

WADE V. DAVIES (TN BPR #016052)
RITCHIE, DILLARD AND DAVIES
606 W. Main Street, Suite 300
Knoxville, TN 37902
(865) 637-0661

## CERTIFICATE OF SERVICE

      I, Ira Lustbader, hereby certify that, on November 1, 2016, a true and correct copy of this Plaintiffs' Status Report in the case of *Brian A. v. Haslam,* has been served on Defendants' counsel Martha A. Campbell, Deputy Attorney General, General Civil Division, P.O. Box 20207, Nashville, TN 37202, and Jonathan Lakey, Pietrangelo Cook, PLC, 6410 Poplar Avenue, Suite 190, Memphis, TN 38119, electronically by operation of the Court's electronic filing system.

DATED:          November 1, 2016

                                          /s/ Ira Lustbader