# EXHIBIT 1

# THE TECHNICAL ASSISTANCE COMMITTEE

# IN THE CASE OF

# *BRIAN A. v. HASLAM*

# SUPPLEMENT TO THE
# MARCH 28, 2017 MONITORING REPORT

May 15, 2017

**TECHNICAL ASSISTANCE COMMITTEE:**


Steven D. Cohen
Senior Fellow
Center for the Study of Social Policy
Washington, D.C

Judith Meltzer
Deputy Director
Center for the Study of Social Policy
Washington, D.C.

Andy Shookhoff
Attorney
Nashville, TN

Paul Vincent
Director
Child Welfare Policy and Practice Group
Montgomery, AL


**TECHNICAL ASSISTANCE COMMITTEE STAFF:**


Michelle Crowley
Kelly Whitfield

2

**INTRODUCTION**

With the entry of the *Brian A*. Settlement Agreement in 2001, the Tennessee Department of Children's Services (DCS) committed to an ambitious, multi-year reform process to comprehensively improve its child welfare policies, practices and outcomes for children and families. Sixteen years later, Tennessee has not only met the requirements for exit from court jurisdiction under the Settlement Agreement, but has transformed what had been a problem-plagued child welfare system into one that, while not without challenges, embraces best practices and is appropriately considered in many areas to be a national model.

In advance of the Status Conference set for May 26, 2017, the parties contemplate filing a joint stipulation and Proposed April 2017 Modified Settlement Agreement and Exit Plan reflecting their agreement that the Department has sustained compliance and "maintenance status" on all of the substantive provisions of the *Brian A*. Settlement Agreement. If the Court approves the Modified Settlement Agreement and Exit Plan, the *Brian A*. Technical Assistance Committee (TAC) will then be relieved of its responsibilities under the Settlement Agreement[1] and the responsibilities for public reporting will shift to a new External Accountability Center established pursuant to Section XIX.A of the Settlement Agreement. It therefore seemed appropriate to the TAC to take this opportunity to reflect on the transformation of Tennessee's child welfare system and to highlight some of the key factors that both contributed to the State's successful reform efforts and that will continue to be important for sustaining what has been achieved.

**TENNESSEE'S CHILD WELFARE SYSTEM: THEN AND NOW**

The allegations in the *Brian A*. Complaint that began this litigation over a decade and a half ago paint a bleak picture of the experience of children in Tennessee's foster care system at that time. Drawing in large part on findings in reports issued by the Tennessee Comptroller's Office and the Tennessee Commission on Children and Youth, the complaint describes a foster care system in which children "routinely spend years, often lose much of their childhoods and suffer additional deprivations, as they are moved from one inadequate placement to another without appropriate services, languishing in state custody":[2]

- "Children are routinely placed in emergency shelters and other temporary holding facilities for upwards of six months at a time because the state has nowhere else to place them…almost 400 children are on waiting lists for needed services and placements";
- "36% of children in DCS custody have been in custody for over two years. Over 17% have been in custody for over four years";

---

[1] The TAC has had three functions under the Settlement Agreement: first, it has served as a resource to the Department in the development and implementation of its reform effort (Settlement Agreement Section XIV); second, it has monitored and reported on the Department's progress in meeting the requirements of the Settlement Agreement (Section XV); and third, it has served a mediation/dispute resolution function (Section XVIII). Since assuming its monitoring responsibilities in 2004, the TAC has issued and filed with the Court fifteen monitoring reports, five supplements to those reports (including this one), and an additional three reports specifically related to concerns raised about TFACTS, the Department's automated information system.

[2] Complaint in *Brian A*. v. Sundquist, (filed on May 10, 2000) at p 1.

- "23% of children…have experienced 10 or more foster care placements."[3]

For those children who are returned to their families, "reunifications are too often attempted without appropriate services or supervision and children. . . must again be removed from their parents' home."[4]

For those children who cannot return to their families, "numerous system deficiencies in the adoption process prevent or delay children from being adopted"; "termination is routinely not pursued in a timely manner and. . . too often many years pass before any concrete efforts toward adoption are taken."[5] "Thousands of children in DCS custody grow too old to be strong candidates for adoption"[6] and "older children who cannot return home or be adopted are regularly discharged from the foster care system lacking education, training, and life skills necessary to live independently."[7]

The complaint describes a system with limited capacity to support good casework practice:

- "Dangerously high caseloads make it virtually impossible to adequately monitor children's needs and to ensure that they receive necessary services."
- "Inadequate hiring criteria and grossly inadequate training exacerbate the problem."
- "DCS administrators, supervisors and case managers often lack the most basic knowledge of child welfare issues."
- "Gross and repeated financial mismanagement in its child welfare administration have occurred at the same time that the amount of funding for children's services has declined."
- "Millions of dollars already designated and funds otherwise available for child welfare services each year are either unaccounted for, unused, or wasted due to gross mismanagement and a lack of adequate accounting controls and procedures."[8]

The Department "lacks an adequate management information system to provide accurate data on children in DCS custody." There were "major problems in ensuring data integrity and user accountability" and the system was "unable to provide basic critical information on the functioning of the system". The lack of an adequate information system "impedes efficient and effective treatment of children in DCS custody."[9]

---

[3] Complaint at p.2.
[4] Complaint at p.65.
[5] Complaint at pp. 65-66.
[6] Complaint at p.57.
[7] Complaint at pp.68-69
[8] Complaint at p 2.
[9] Complaint at p.73.

4

In stark contrast to the allegations in the complaint, the current experience of children in foster care in Tennessee is dramatically different. As the TAC has reported:[10]

*Most abused and neglected children in Tennessee do not remain in foster care for years and in fact, Tennessee is among the better performing child welfare systems in achieving timely permanency for children.*

- Half of Tennessee children leave foster care to reunification with their families or to adoption within 12 months and 75% leave foster care to reunification or adoption within two years—better performance than the large majority of states participating in the Multistate Foster Care Data Archive.

- At any given time fewer than 10% of the children in DCS custody have been in care for more than three years.

- When children are returned to their families, reunification is generally successful. For the most recent monitoring period (using the measure of reentry established by the Settlement Agreement), just 4% of children reentered DCS custody within 12 months of discharge, a percentage point better than the performance target of 5% established by the Settlement Agreement.

- The process for terminating parental rights and freeing children for adoption who cannot safely return home is generally carried out in a timely manner. For the most recent monitoring period, petitions to terminate parental rights (TPR) were filed within 90 days of adoption becoming the sole goal in 91% of the cases; and orders of guardianship were achieved within 12 months of the filing of TPR in 92% of the cases.

- And of the 1,323 children for whom parental rights were terminated or surrendered between January 1, 2014 and January 1, 2015, 73% (961) had their adoption finalized or permanent guardianship granted within 12 months of entering full guardianship.

*While the Department continues to face periodic challenges to ensuring availability of the right placements for some children, placement experiences overall are vastly different than those described in the complaint. For most children in foster care in Tennessee, placement moves are relatively few; and the Department has dramatically reduced its use of temporary placement facilities and ended its use of emergency shelters and large orphanage style placements.*

---

[10] The most recent monitoring report issued by the TAC on March 28, 2017 presents extensive data related to the current performance of the Department with respect to the requirements of the Settlement Agreement, and includes references to relevant historical data for purposes of comparison with current performance. The discussion that follows is intended to highlight current performance in contrast to key areas of concern identified in the complaint, not to replicate or replace the more comprehensive discussion and data presentation in the March 2017 Monitoring Report. While some limited data is included below for illustrative purposes, it is the data in the March 2017 Monitoring Report that supports the TAC's description of current performance presented in this Supplement.

5

- Of the 4,668 children who entered care in 2013, 47% experienced no placement moves while in care, 26% experienced one placement move, and 18% experienced two or three placement moves. Only 1% experienced more than 10 moves.

- Between January and June 2016, only 156 class members were placed in temporary placement facilities and only nine of those children remained in those facilities for longer than 60 days.

- Of the 618 class members whose cases were reviewed over the course of the past three annual Quality Service Reviews, almost all (98%) were found to be in appropriate placements that met their needs.

- While there remain times when the Department struggles to quickly find appropriate placements for children with high needs, the Department has the capacity to diagnose the problems when they occur and initiate systemic actions to address placement challenges.

*Children entering foster care in Tennessee are now much more likely to be placed with families than in congregate care facilities, much less likely to be separated from their siblings, much more likely to be placed in or near their home communities, and much more likely to be able to attend public schools with their peers than they were at the time the Settlement Agreement was entered.* These placement-related accomplishments represent a dramatic shift in policies and practices across the state, not only those of DCS and its staff, but of private providers and local school districts as well.

*The Department now seeks to find a permanent and stable family for all children in its care, no longer excluding the many adolescents who used to have "goals" of "long-term foster care" or "other planned permanent living arrangement[,]" goals which in most cases meant that older youth were destined to leave foster care at age 18 without adult supports.* The emphasis on permanency for older youth in care has reduced the number and percentage of children "aging out" of care without a permanent family. Children in foster care who do turn 18 without achieving permanency, and who in the past would have faced legal independence with few or no supports, now have the option to enter Extension of Foster Care (ETF) until age 21 and to continue to receive a range of services and supports for a successful transition to adulthood.

*Tennessee now has a "practice model"—a set of underlying values and an approach to working with families and children that emphasizes engagement of the family, depends on a thorough assessment of a family's strengths and needs, and involves families and youth in the case planning and decision making process—and a corresponding set of policies and procedures.* Both the outcomes the Department seeks to achieve for children and their families and the core strategies for achieving them are broadly understood by both DCS staff and the private providers that the Department contracts with, something that was not the case when the Settlement Agreement was entered and an accomplishment that is the result of strategic interventions over many years.

6

As the TAC has observed in previous monitoring reports, the Department's achievements required major investments in the "infrastructure" necessary to support good child welfare practice.

*Improvements in staffing*:

- *No reform effort can succeed without a substantial investment in recruitment, training, and retention of competent, caring, and committed staff.* Hiring policies and practices prior to the lawsuit filing made no distinction between a Bachelor's degree in geology and a Bachelor's degree in social work. A generic Civil Service scoring process often resulted in job applicants with little or no relevant experience and skills scoring significantly higher on the case manager registers than social workers. The hiring process has been revamped to specifically value child welfare system experience and social work skills so that the Department now hires staff with relevant qualifications.

- *The Department's training curricula have been thoroughly revised to support and promote the knowledge and skills envisioned by the Practice Model*; and evaluation of both the Department's own performance and that of private agencies with whom the Department contracts is focused on the extent to which the desired outcomes for children and families are being achieved.

- *The Department has addressed two critical challenges to maintaining a well-qualified workforce: the historically low pay of DCS case managers relative to comparable positions in the public and private sector and the historically high caseloads that precluded case managers from being able to provide the level of attention that children and families need and deserve.* Tennessee has substantially increased its starting salaries for every class of case manager position and has dramatically decreased foster care case manager caseloads. Between January 2016 and December 2016, monthly statewide compliance with Settlement Agreement caseload standards ranged between 94% and 96%. Complaints about case managers not visiting the children on their caseloads, about resource parents not being able to contact the case manager (or not even knowing who the case manager was), which were depressingly commonplace when the lawsuit was filed, are now rare. Workers now routinely visit the children on their caseloads on a regular basis.

*Improvements in Financial Management:*

- *Far from being mismanaged as was alleged in the original complaint, the Department now benefits from a strong financial management team that administers the budget effectively, maximizes the draw-down of federal funds, consistently makes a persuasive case for adequate funding for DCS, even in very tight financial times, and continues to receive positive marks for its fiscal accountability.*

7

*Improvements in Placement Quality and Capacity:*

- *The Department has successfully built and continues to maintain its resource home capacity so that children entering foster care can be placed with qualified and trained families.* Recruiting new resource parents with the right sets of qualities and skills to support children and youth is a constant challenge. Recognizing the key role that well-trained and actively involved resource parents play with respect to a wide range of important outcomes and performance measures, Department leadership focused on the development and implementation of regional recruitment plans that increase the use of kinship resources, improve responsiveness to inquiries from potential resource parents, target recruitment of resource parents willing and able to serve older children and sibling groups, and better engage and support resource parents. This work is ongoing.

- *The Department has altered its relationships with and oversight of private providers with whom it contracts for placements and services.* The Department employs a thoughtfully conceived and well-executed performance-based contracting system which contains strong mechanisms for provider review and oversight of performance quality.

- *DCS has addressed a number of critical concerns identified in the lawsuit about the lack of clear and effective policies and procedures governing the use of psychotropic drugs for children in DCS custody and about the improper use of restraints and seclusion.* The Department has implemented best practice policies and procedures governing use of psychotropic medications, restraints, and seclusion, and established credible oversight mechanisms for ensuring ongoing compliance with these policies and procedures.

*Improvements in Information Technology and Quality Assurance*

- *As the Department has moved forward with its outcome-focused reform efforts, it has moved from an organization that had been largely unable to produce basic data about the children in its custody to one that is increasingly data-driven.* Despite a problem-plagued initial implementation of the Tennessee Family and Child Tracking System (TFACTS), the Department now benefits from a well-functioning automated information system and an extremely capable and customer-focused Office of Information Technology that is leveraging advances in web-based technology to support both front-line and management staff.

- *The Department uses its robust data capacity to understand its performance, to develop improvement strategies and set goals, and then to track progress toward achieving those goals. It focuses on both the specific outcome goals and performance measures set forth in the Settlement Agreement and on additional goals and measures that the Department has established for its own management purposes.* In order to do this, the Department has created a quality improvement structure, both at the state level and within each of its regional offices, led by an Office of Continuous Quality Improvement and supported by regional staff with responsibilities to support and facilitate continuous quality improvement (CQI) efforts in the regions.

8

- *The Department has established a well-designed Quality Service Review (QSR) process as an ongoing method for gathering information on the quality of service delivery for children and families and data on both child and family outcomes and system performance.* Reviewers include trained DCS staff and outside stakeholders from across the state committed to examining how the system operates and the results it produces from the perspective of children, families, resource parents and other professionals. The Department has expended considerable effort over the past several years not only on helping regions use the feedback that the annual Quality Service Reviews provide to develop and implement regional practice improvement plans, but to actively use the QSR practice rubric and protocol to describe desired practice as the touchstone for practice improvement in general. That focused work has paid off as evidenced by the fact that for the past two years the QSR scores in the core system performance areas have reached levels that are reflective of a well-functioning child welfare system.

*Efforts to Address Racial Disparity*

At the time that the Settlement Agreement was entered, professionals around the country were just beginning to publicly acknowledge that in many child welfare systems, children of color were faring worse than white children on measures of both outcomes and system performance. In Tennessee, a report from the Comptroller's Office found that to be the case for minority children in DCS custody, and the complaint, in alleging that this disparity constituted racial discrimination, cited language in the Comptroller's report that "it is unlikely that differences between minority and Caucasian children are based on chance", leading to the conclusion "that race is a factor in whether or not children receive adequate services."[11]

In response to this concern, the Settlement Agreement required the Department to commission a racial disparity study and to implement the recommendations of that study. As discussed in the March 2017 Monitoring Report, the study resulted in 10 recommendations which the Department implemented. The Department now regularly engages in targeted recruitment efforts to increase African American resource homes, supports relative caregiver programs in every region, provides a "subsidized permanent guardianship" permanency option, and ensures that kinship resource homes receive financial and other support comparable to non-relative resource homes, all of which were identified by the author of the racial disparity study as actions likely to positively impact the experience of African American children. Consistent with the racial disparity study recommendations, the Department continues to recruit and maintain a diverse workforce and continues to ensure that staff receive cultural competency training. And the Department has built its capacity to produce and analyze data by race and ethnicity.

In the 14 years since the Racial Disparity Study was conducted, researchers, policy makers, and practitioners have increasingly recognized how complicated it is to separate out the effect of race (including the effect of implicit bias in child abuse reporting and judicial and pre-custodial decision making) from other factors that impact outcomes (*e.g.,* poverty, family structure, age distribution of the at risk population), and how challenging it is, in light of the interplay of these factors, for child welfare systems to implement strategies to reduce disparity. Fortunately, the Department now has the robust data capacity, and through its partnership with Chapin Hall, the

---

[11] Complaint at p.5.

necessary analytic support, to be able to understand the extent to which race and other factors contribute to the differences in outcomes between minority and white children.  As reflected in the work plan for the External Accountability Center, the Department remains committed to using this capacity to fashion and implement strategies to reduce racial disparity.

*Emphasis on Front-line Practice*

As important as infrastructure and policy development have been to the success of the Department's reform efforts, the Department's leaders correctly understand that it is the quality of front-line casework—the critical day-to-day interactions between children, families, case managers, helping professionals, and the community that are needed to make sure that children are safe, healthy, and able to develop and succeed—that is essential to achieving good outcomes for the children and families the Department serves.  Defining DCS' Practice Model was a critical first step, but it then took multiple interventions over many years to move the Practice Model from words to reality.  In its practice improvement work, DCS appropriately focused on the core practice elements of the Child and Family Team Process as priorities:

- engaging children and families;
- forming strong Child and Family Teams that include not only professionals, but relatives and others who are part of the family's informal support network;
- assisting those teams in assessing the strengths and needs of the family;
- having the teams develop and track the implementation of individualized case plans that build on those strengths and address those needs; and
- using the Child and Family Team and the team meeting process for problem solving and key decision making throughout the life of each case.

Achieving and maintaining high quality casework depends on dedicated and qualified front-line staff, strong regional leadership, and on supervisors having both the skills relevant to the core practice elements and the coaching and mentoring ability to develop these skills in the case managers they supervise.  The Department has emphasized and continues to emphasize the ability of supervisors to model, mentor, and coach high quality practice in its selection of new supervisors and in its supervisor training.  The supervisory performance evaluation process has been redesigned to assess supervisory skills and to create job performance plans that build on the supervisor's strengths and address any areas of deficit.  The Department has also created a set of expectations for regular supervisor-case manager interaction focused specifically on the quality of the core skills of engagement, teaming, assessment, case planning, and plan implementation, and has implemented a performance evaluation process for case managers that emphasizes the core practice skills.

## KEY FACTORS THAT CONTRIBUTED TO SUCCESSFUL REFORM AND THAT WILL BE REQUIRED TO SUSTAIN AND BUILD UPON THAT SUCCESS

While there are many factors that have contributed to the success of Tennessee's child welfare system reform effort, some deserve special mention because they remain critical to the Department's ability to sustain and build upon its success.

**Leadership and Resources**

It goes without saying that this reform would not have been possible without extremely dedicated and talented departmental leadership, both at the Central Office and in the regions. Over the past sixteen years, the Department has benefited from a series of Commissioners whose substantive experience and leadership skills and styles were well suited to the particular developmental stage of the reform associated with their tenure, and who have been able to assemble and empower a capable and committed leadership team to meet the challenges associated with each stage.

However, Tennessee's impressive record of success in implementing an ambitious child welfare system reform effort would not have been possible without consistent gubernatorial and legislative support as well. The State remained committed to the principles and goals of the reform across administrations and through governmental transitions. This reform was initiated under Governor Sundquist, carried forward under Governor Bredesen, and continued and strengthened under Governor Haslam.

Throughout that time, the Tennessee legislature has both allocated necessary resources to support the Department's work (even during times of statewide budgetary problems resulting from state revenue shortfalls) and enacted legislation to allow the Department to participate in federally-supported innovative approaches to better supporting children and families.

The support of the Governor and Legislature was not only important for leveraging Title IV-E and Medicaid funds to support the Department's work, but it was also key to attracting supplemental resources for the Department's work from state and national foundations (including both financial support and access to technical assistance). The ability (and willingness) to take advantage of outside funding and outside technical assistance gave the Department the opportunity to jump start or pilot certain initiatives that ultimately became core elements of the system improvement.

The continuity of effort that has characterized Tennessee's child welfare system reform has been incredibly important to the state's progress. Across administrations, the Department's leaders have persisted in pursuing comprehensive systemic reform even in the face of discouraging events—tragic individual cases, initiatives that did not work that well the first time around and had to be improved or discarded, data that revealed additional problems that needed to be fixed. The Department's leadership has been largely able to resist the kind of crisis-oriented responses that all too often lead to fragmented short-term efforts that in the end only slow progress.

**Recruiting and Supporting Caring and Committed Front-Line Staff**

As important as good leadership is, a child welfare system is ultimately only as strong as its front-line staff. Working effectively with abused and neglected children is extremely challenging work that demands special knowledge, skill, and temperament. Even when things go well, the work can be both physically and emotionally exhausting. And even when the work is done conscientiously, things often do not go as well as hoped, and sometimes go tragically

11

wrong. Recruitment and retention of caring and committed front-line case managers and case manager supervisors is therefore always going to be a challenge.

Offering reasonably competitive salaries, keeping caseloads to generally manageable levels, investing in training (including the Bachelor of Social Work and Master of Social Work stipend programs), providing skilled and supportive supervision and ensuring that case managers can access services and supports for the children and families on their caseloads, have been and will continue to be important to attracting and retaining caring and committed staff.

Over the course of the reform, front-line staff have expressed higher levels of satisfaction (and less frustration) when they felt their voices and perspectives were being heard by the Central Office and when they were actively engaged in policy, practice, and resource decisions that affected their day-to-day work. The current leadership has increasingly involved front-line staff in setting priorities and developing strategies to address those priorities. Continuing to do so not only will likely result in better improvement plans, but may very well help improve retention.


**Resource Parent Recruitment and Support**

Tennessee is appropriately committed to providing a caring and capable resource family for every child in care who can be safely served in that setting. The vast majority of children can be safely served in family settings, particularly given the ability of the Department and private providers to "wrap" services around a resource family to address a child's special needs.

As conscientious as Tennessee has been in its efforts to recruit and retain resource parents, the Department and its private provider partners will never be able to let up on recruitment efforts and will always be challenged to find new ways to reach out to the community to explain the need and the opportunity to become a resource parent. And as much as the Department and its partners have done to develop special training and supportive services for resource parents serving children with special needs, they will continue to be challenged to improve that training and support.

As the results of the resource parent exit surveys that the Department regularly conducts reflect, the primary reasons for resource parent attrition are unrelated to anything that "better retention efforts" could address (e.g., adoption of the children that they had been fostering, reunification of a child who had been in a kinship resource home that had only become a resource home to serve that particular child, change in the resource parent's circumstances). The Department, of course, should always look for ways to better support resource parents (and the Department is already identifying ways to leverage informal community supports around resource parents) but even the best retention efforts will not alleviate the need for consistent, conscientious and creative resource parent recruitment.

12

**A Commitment to Continuous Quality Improvement**

Much of the success of the Department's reform has depended on improvements in leadership and organizational structure, adoption of new approaches to practice, revisions of policies, implementation of new processes, investment in infrastructure, and ensuring adequate resources; and these will all remain important. However, to sustain and build upon this success will require that the Department continue to use its Quality Assurance (QA) and CQI processes to identify, understand, learn from, and respond to those situations in which performance is falling short of expectations.

Child welfare practice is inherently difficult, involving many stakeholders with competing interests and philosophies in work where there is little to no tolerance for error. This fact often leads child welfare systems to turn inward and become defensive about their practices and performance. However, achieving the *Brian A.* reforms required an ability to objectively assess and own the system's failures as a first step to developing strategic interventions for reform. DCS leaders met many of its challenges by embracing best practices in the child welfare field, recognizing the expertise of its own staff and stakeholders and wisely using external technical assistance to support the development and implementation of reform strategies. Sustaining the work will require that the Department not only recognize the difficult and effective work of its staff and applaud current success, but that it continually reappraise what is working and what is not and remain open to new interventions as needed.

The Department's ability to use timely and accurate aggregate data to understand performance on key outcome and process measures will continue to be important. The Department is in an enviable position in this regard given the quality of the Department's data, the sophisticated analyses of that data available through the Department's partnership with Chapin Hall, and the increasing comfort and skill that DCS Central Office and regional staff are developing in using that data for strategic planning.

Equally important is the Department's continued use of qualitative data, particularly the findings and insights generated through the QSR, to understand and improve the experiences of children in care. While quantitative data can tell you how quickly children are achieving permanency, the aggregate data has limited utility as a source of information about some of the things that children in foster care identify as being most important to them: how safe and supported they feel in their placements, whether their needs are being met, whether they have the opportunities to do the kinds of things children of their age who are not in care normally get to do, whether they are treated with respect, whether they are listened to, whether their opinions, perspectives, and preferences are valued. The QSR provides feedback relevant to those aspects of a child's experience in care. The QSR also serves as the primary source of similarly relevant "customer feedback" on the experiences of both parents and resource parents.

Working with children and families in crisis is extremely challenging and even in the best functioning child welfare systems, resources will become misaligned, processes will break down, and practice in some cases will be inadequate. A great strength of the Department's leadership in recent years has been its ability and willingness to identify and candidly acknowledge what is working and what is not working, and to utilize a CQI process to fashion and implement

strategies and allocate resources to respond to shortfalls in practice or performance.   The candor to identify and acknowledge shortcomings and the commitment and capacity to learn from and respond to those shortcomings will be critical to the Department's continued success.

## CONCLUSION

The TAC has been privileged to observe, report on, and support the work of the scores of capable, committed, and caring individuals who have collaborated over the past 16 years to improve system performance and outcomes for Tennessee's abused and neglected children.

Tennessee's child welfare system is far from perfect, but over these many years, the organizational culture has shifted significantly toward one that is more respectful and supportive of the families it serves and those who work with them.

The Department of Children's Services is much better at helping families identify the changes that they need to make and the supports they can rely on in making them, rather than imposing service plans on them.  It provides families with a broader range of services, more tailored to individual circumstances, than it did a decade and a half ago.  It gives additional prominence to the voices of youth in care, not just in their own individual case planning, but also, through feedback from youth advisory boards and from youth surveys, in shaping Department policies and practices.

And the Department is much better in understanding the extraordinary pressures of front-line child welfare work and has taken actions not only to lessen those pressures, but also to convey respect and appreciation for the staff who deal with them.  The system today is not only far less crisis-driven than in the past, but also less punitive, less ready to devalue both the people it is supposed to be helping and the people who are supposed to help them.

We know from our experience in Tennessee and in other parts of the country that this work is never done.  The complex and difficult nature of child welfare work makes it all too easy for reform to unravel.  The success of Tennessee's reform required continued focus and hard work by DCS leadership, front-line staff, private providers, resource parents, and advocates and consistent support for that work from the Governor and the Legislature.  Sustaining and building upon that success will require no less.