```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF TENNESSEE
 2                      NASHVILLE DIVISION

 3       BRIAN A., et al.,            )
                                      )
 4                  Plaintiffs,       )
                                      ) Case No.
 5            v.                      ) 3:00-cv-00445
                                      )
 6       WILLIAM HASLAM, et al.,      ) CHIEF JUDGE CRENSHAW
                                      )
 7                  Defendants.       )
                                      )
 8   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 9                      BEFORE THE HONORABLE

10        CHIEF DISTRICT JUDGE WAVERLY D. CRENSHAW, JR.

11                   TRANSCRIPT OF PROCEEDINGS

12                        June 8, 2017
     - - - - - - - - - - - - - - - - - - - - - - - - - - - -
13
     APPEARANCES:
14
                 For the Plaintiff:  Ms. Jacqueline B. Dixon
15                                    Fifth Third Center, Suite 2260
                                      Nashville,Tennessee 37219
16
                                      Mr. Ira P. Lustbader
17                                    Ms. Daniele Gerard
                                      88 Pine Street, Suite 800
18                                    New York, New York 10005

19               For the Defendant:  Mr. Jonathan P. Lakey
                                      6410 Poplar Avenue, Suite 190
20                                    Memphis, Tennessee 38119

21                                    Mr. Alexander Stuart Rieger
                                      P.O. Box 20207
22                                    Nashville, Tennessee 37202
     PREPARED BY:
23                        LISE S. MATTHEWS, RMR, CRR, CRC
                             Official Court Reporter
24                          801 Broadway, Room A839
                               Nashville, TN 37203
25                      lise_matthews@tnmd.uscourts.gov
```

1    The above-styled cause came on to be heard on

2    June 8, 2017, before the Honorable WAVERLY D. CRENSHAW, JR.,

3    Chief District Judge, when the following proceedings were

4    had, to-wit:

5    THE COURT:  All right.  Be seated.  Good

6    afternoon.  We're here on Case 00-445, *Brian A., et al.,*

7    *versus Donald Sundquist*.  I guess it's now Haslam, et al.

8    If counsel can introduce themselves for the

9    record.

10   MS. DIXON:  Your Honor, Jackie Dixon here on

11   behalf of the plaintiffs, and I have with me Ira Lustbader

12   and Daniele Gerard from Children's Rights in New York.

13   THE COURT:  All right.

14   MR. LAKEY:  And, Your Honor, for the State

15   defendants, Jonathan Lakey and General Alexander Rieger.

16   THE COURT:  Okay.  I know we're here today on the

17   State's motion to partially terminate the jurisdiction of the

18   Court based upon a 2017 modified settlement agreement and

19   exit plan.

20   First of all, let me -- let me say that y'all have

21   been at this case for quite a while, since 2000 to the

22   present.  And your judge was Judge Campbell.  Unfortunately,

23   back in December, I think, Judge Campbell retired from the

24   bench for health reasons, and I got assigned the case.  And I

25   have not been able to catch up with you all over the last 17

1    years for a number of reasons, primarily because we're two
2    judges short in this district, which means Judge Trauger and
3    I are doing the work of four judges.  And your filings in
4    this case I think exceed 600.  And I simply have not had an
5    opportunity to review all of those and get up to speed so we
6    can take action.  But it would be helpful today for you to
7    sort of give me an overview of where you are.  I do note that
8    it appears significant progress has been made, and that goes
9    to the efforts of all the parties.  And then maybe during the
10   hearing we can talk about some things that you can file after
11   the hearing that will help me get up to speed and put me in a
12   position that I can make a reasoned decision on these pending
13   motions.  The Court anticipates I can catch up with the
14   parties, but I'm just not there yet.  And I think if you make
15   some filings after this, I've got some in mind, and you may
16   have some in mind, it will help me review the pending motions
17   and get a ruling on it.
18           So with that said, I'll turn it over to you all.
19   Okay.
20           MR. LUSTBADER:  Good afternoon, Your Honor.
21           THE COURT:  Good afternoon.
22           MR. LUSTBADER:  Ira Lustbader for plaintiffs.
23   Your Honor, I'll do my best to cast a broader context.  And,
24   obviously, we can fill in whatever the Court would benefit
25   from in subsequent filings.  But in a big-picture sense, Your

Honor, this is a class action Civil Rights lawsuit filed in
2000 on behalf of children who are or will be in the State's
foster care custody.  It was settled through mediation under
a 2001 consent decree.  And there's been ongoing jurisdiction
of the Court throughout that time.  The I guess some 16-,
17-year history of the case under the Court's docket is
obviously significant, but the present procedural posture is
as follows:  the parties' obligations are currently governed
by an April 2016 modified settlement agreement and exit plan.
And that's Docket 355.

In approving that 2016 document, Judge Campbell
ruled that defendants had achieved compliance, which the
parties and the Court refer to as maintenance status, of all
substantive obligations in Sections 2 through 13 and Section
16, which comprise approximately 140 improvement benchmarks
in the functioning of the Tennessee Department of Children's
Services.

THE COURT:  And I went through the 2017 in
preparation for this.  And I was -- and you all probably know
all of this.  I'm the last one to the party here.  How did
you reach these benchmarks?  How did those come into being?

MR. LUSTBADER:  So those benchmarks originally
were reached through a period of mediated settlement, which I
believe took a good six months, back in 2000 and early 2001,
with then the ongoing flexibility to modify some of them over

1  time.  And they were informed by federal law and best

2  practice and policy and state policy in the field of child

3  welfare and particularly foster care with the input and

4  technical assistance of substantive mediators and monitors in

5  this case.

6                THE COURT:  Did this TAC, the Technical

7  Assistance Committee -- has it -- has its members been the

8  same for the entire 17 years?

9                MR. LUSTBADER:  Yes, Your Honor, and two of them

10  are here.  Just to recognize Judy Meltser and Andy Shookoff,

11  who are both here in the courtroom.

12                THE COURT:  The Court knows Mr. Shookoff well.

13                MR. LUSTBADER:  Yes, I'm sure.  And there are

14  actually others in addition to them.

15                And that grew from a single monitor to a body of

16  several Technical Assistance Committee folks who are both

17  serving as monitors, technical assistants and in a matter of

18  mediating any disputes between the parties.  They have served

19  all of those roles for the entire time.

20                THE COURT:  So what was the -- what was the

21  State's role with the Technical Assistance Committee?  Did

22  you have a member on the roll?

23                MR. LUSTBADER:  They didn't have a member, Your

24  Honor.  The TAC, or T-A-C, Technical Assistance Committee,

25  served to help provide the State leadership with technical

assistance in implementing the settlement and building
technical capacity and quality assurance capacity within the
agency over the years.  That was one of the agreed roles.
Because of their national reputation they've been able to
bring in a wide range of technical experience and assistance
in the implementation process.

THE COURT:  And if the State -- and I guess did
you have instances where the State asked for modifications
and --

MR. LUSTBADER:  All of the ongoing modifications
to either particular measures, or under this structure, what
happens is each time a new set of deliverables fell into this
maintenance category, we would then have a joint modification
presented for approval, so then the actual operative decree
would always be current with all the items that were in
maintenance or compliance and those hadn't -- that had not
yet reached it.

THE COURT:  And what happened to all the children
while all this was going on?

MR. LUSTBADER:  I'm sorry?

THE COURT:  What had happened to the children, I
guess the members of the class?

MR. LUSTBADER:  So the class itself has fluctuated
from upwards of I think 8- or 9,000 down to 4,000.  It's
currently around 6,000.  And it was brought on behalf of nine

```
1    individual named plaintiff representative children.
2           And so in terms of the functioning and the
3    well-being of the class, that is the core of what these
4    obligations reflect in terms of improvements in the
5    infrastructure and outcomes for these kids.
6           THE COURT:  But over 17 years, I would assume
7    you've had children who --
8           MR. LUSTBADER:  Correct.
9           THE COURT:  -- were in the class and are no longer
10   in the class.
11          MR. LUSTBADER:  So the class was designed as fluid
12   from the beginning.
13          THE COURT:  Yeah.
14          MR. LUSTBADER:  And so obviously you have folks
15   that enter custody, then they may leave custody either
16   because they're reunified with their biological families or
17   they're adopted by either family members or strangers or by
18   their foster parents.  You have children who might achieve
19   guardianship with a family friend.  You have children who
20   might age out and then leave the system that way.
21          THE COURT:  And then new children coming in?
22          MR. LUSTBADER:  Correct.  A constantly fluid
23   class.  And so the case was always from its inception about
24   ensuring the accountability over this agency, the Department
25   of Children's Services, to make sure it had the aggregate
```

1    tools and infrastructure to serve the whole fluid class on an

2    ongoing basis.

3            And so a lot of the metrics that you'll see in the

4    monitoring reports reflect aggregate data and performance on

5    this fluid class.  And that's why we needed the technical

6    assistance of a monitoring team that would be the least

7    intrusive way to report on performance on this fluid class

8    and on these aggregate measures.

9            THE COURT:  And did the class members have a lead

10   class member or did -- how were their -- how did we solicit

11   the input of the members of the class?

12           MR. LUSTBADER:  So it being a minor class, the

13   initial plaintiffs were minors represented by next friends.

14   And then when the class was certified and then the settlement

15   included a certified class, class counsel was appointed to

16   represent the interest of the class throughout this

17   litigation.  And so class counsel has represented the

18   interest of the minor class throughout --

19           THE COURT:  And that's you.

20           MR. LUSTBADER:  And that's myself and Ms. Dixon --

21           THE COURT:  Ms. Dixon.

22           MR. LUSTBADER:  -- and Mr. Raybin and then folks

23   both out in Memphis and in Knoxville as well.  There are

24   members of the team there.

25           THE COURT:  All right.  Thanks.

1          MR. LUSTBADER:  So, Your Honor, under the 2016

2     modified settlement agreement, and again that's Docket 355,

3     with all 140 obligations in maintenance status, and that was

4     hit last spring, defendants then had the opportunity to show

5     that they could sustain that maintenance status for 12

6     months.  So put another way, the parties defined --

7          THE COURT:  You're saying 355.  Do you mean 555?

8          MR. LUSTBADER:  Yes, Your Honor.

9          THE COURT:  All right.  Good.

10          MR. LUSTBADER:  My mistake.  Nice catch.  Yes,

11     555.

12          THE COURT:  Okay.

13          MR. LUSTBADER:  And so the idea there was that the

14     parties defined the durability of these achievements that

15     would be necessary to request termination of jurisdiction,

16     meaning that if you could hit all of these measures and then

17     hold them for 12 months, right? the -- the defendants would

18     then be able to file a notice of compliance that seeks

19     partial termination of jurisdiction over all of those

20     obligations, leaving only one, which is Section 19, which

21     says that if the Court decides to terminate partially

22     jurisdiction over all those measures, Section 19 creates an

23     internal -- external accountability center, which would then

24     continue public reports for 18 months, every six months, on

25     how the agency is doing, as a measure of keeping public

1  accountability just under that piece.

2          THE COURT:  Okay.  Go to page -- well, I'm looking

3  at Document 579-1, which is your 2000- --

4          MR. LUSTBADER:  '17.

5          THE COURT:  That's the 2017.  But I think I read

6  that the definition of maintenance has not changed.

7          MR. LUSTBADER:  Correct.

8          THE COURT:  Okay.  So walk me through Number 2,

9  what maintenance means.  And it looks like it's the same --

10 or nearly the same as 3.

11         MR. LUSTBADER:  So the idea of maintenance, Your

12 Honor, is there are items in the --

13         THE COURT:  Benchmarks?

14         MR. LUSTBADER:  There are benchmarks and

15 processes.  So there are some things that have numbers

16 attached to them and there are some obligations that don't

17 have numbers attached to them.  And so the parties agreed

18 with -- with the monitors' help that maintenance would mean

19 what is the level of performance, whether you hit the

20 minimum, if it's a number benchmark, or if you hit the

21 qualitative judgment in terms of performance through the

22 monitors' input on a particular process, that would allow you

23 to exit.  And then you would have to maintain at least that

24 level of performance as determined by the monitors for 12

25 months in order to earn that right to ask for exit.

1          THE COURT:  And the monitors is the TAC?

2          MR. LUSTBADER:  Yes.  And we vested the monitors,

3     the TAC, with the authority to make that decision.

4          THE COURT:  And they issued a report yearly?

5          MR. LUSTBADER:  Yes.  At least yearly.  Right.

6     And so -- that's correct, Your Honor.  And so the -- the TAC,

7     after the April 2016 modified settlement agreement was

8     approved and all 140 measures were found to be in

9     maintenance, then this year the TAC filed two reports, one

10    dated March 28th and filed on April 4th, and that's Document

11    576, and a supplement --

12         THE COURT:  May 15?

13         MR. LUSTBADER:  May 15th.  Correct.  And so based

14    on those reports, Your Honor, the parties then filed and

15    requested that the Court approve this April current version

16    2017 modified settlement agreement and exit plan.  And that

17    was filed on May 16th, and that's 579.

18         THE COURT:  I got 579.  And what was the first one

19    you filed?  The March report is document what now?

20         MR. LUSTBADER:  So the two reports filed by the

21    monitors, the TAC, this year are Documents 576 and 578.

22         THE COURT:  Are they the same?

23         MR. LUSTBADER:  No.

24         THE COURT:  Okay.

25         MR. LUSTBADER:  One is a -- a whole annual look at

1  that 12-month period assessing whether they held their

2  performance --

3          THE COURT:  That's the first one?

4          MR. LUSTBADER:  That's the first one.  And then

5  the second one is a supplement that provides, you might say a

6  qualitative overlay to the overall performance and readiness

7  for exit.  And so based on these reports the parties jointly

8  filed and requested that the Court approve the April 2017

9  document, 579.  And that submission is one of the submissions

10  that's pending before Your Honor now.

11          THE COURT:  So is it Document 576 that justifies

12  the maintenance designation and the benchmarks in the '17

13  plan?

14          MR. LUSTBADER:  Correct, 576 and 578.

15          THE COURT:  Of course, that's the one that I don't

16  have, but that's okay.

17          MR. LUSTBADER:  And then the joint stipulation

18  filing, that joint filing of 579, also describes the funding

19  and functioning of this internal -- external accountability

20  center in terms of who will run it, the content of what

21  they'll report on and the frequency, and how it will be

22  staffed for 18 months.  If -- that period of 18 months only

23  begins if and when the Court grants the partial termination

24  of exit.

25          THE COURT:  All right.  Then going back to

1  maintenance definition, maintenance really is whatever the

2  TAC determines has reached substantial compliance?

3             MR. LUSTBADER:  Well, yes, except on items that

4  have minimum numbers -- in order to initially get into

5  maintenance, you have to have hit the minimum number.  And

6  then what's happened over time, Your Honor, as typically more

7  items would come into maintenance, occasionally they would

8  slip a few and they would come out.  If there was a dispute

9  over it, the monitors would lend whether a slippage was not

10 significant enough to take them out of maintenance, or a

11 one-time thing, and most of the time the parties agreed to

12 that.  But in any event the monitors would get to make that

13 determination.  So over time that number of maintenance

14 worthy categories kept expanding.

15             THE COURT:  And then do I gather that the

16 monitors, which is really the Technical Assistance

17 Committee --

18             MR. LUSTBADER:  Correct.

19             THE COURT:  -- has at all times been in

20 communication with the State, the Department?

21             MR. LUSTBADER:  Deeply so, Your Honor.  And the

22 monitors have actually had full-time staff embedded within

23 the agency tapped into their ongoing data systems with full

24 access to staffing and data and reporting so they can

25 interview and access information realtime year round.

1          THE COURT:  So I gather -- and this is -- this is

2    really helpful.  The 2001 consent decree created an agreement

3    regarding injunctive relief.

4          MR. LUSTBADER:  Correct, prospective injunctive

5    only.

6          THE COURT:  Only.  There's no request here for any

7    damages.

8          MR. LUSTBADER:  Correct, no damages.

9          THE COURT:  Okay.

10          MR. LUSTBADER:  This is prospective injunctive

11    relief for a fluid certified class of --

12          THE COURT:  And what about attorneys' fees?

13          MR. LUSTBADER:  Attorneys' fees was also agreed to

14    in the 2001 agreement, and over time has actually been

15    negotiated and then periodically approved each time by the

16    Court.

17          THE COURT:  And who's been -- how did they get --

18    are there any attorney fee issues remaining?

19          MR. LUSTBADER:  The last one was actually entered

20    probably several months ago, and presumably there would be

21    one more that we would jointly negotiate at some point that

22    brings us forward.

23          THE COURT:  And was that determined by the

24    monitors?

25          MR. LUSTBADER:  No.  The attorneys' fees have very

1  efficiently actually been determined through negotiation

2  between both sides.

3          THE COURT:  Okay.

4          MR. LUSTBADER:  And then a joint presentation to

5  the Court for approval with all the underlying documentation.

6          THE COURT:  So in the 2017 report you're telling

7  the Court I think that since December of 2015 -- is that

8  right?  -- things -- all the benchmarks have been in

9  substantial compliance or maintenance?

10          MR. LUSTBADER:  Correct.  So -- so the -- the

11  12-month period that brought all of these items into

12  maintenance ended at the end of 2015 calendar year.

13          THE COURT:  Oh.

14          MR. LUSTBADER:  And then the 12-month period that

15  the parties and the TAC are agreeing allows them to show that

16  they held it for 12 months, that ended in the end of '16

17  calendar year.  And so that's why the early '17 reports and

18  the current papers before, Your Honor.

19          THE COURT:  Okay.

20          MR. LUSTBADER:  And so, Your Honor, from our

21  perspective, as plaintiffs obviously deeply immersed in this

22  from the beginning, we have very thoughtfully determined that

23  we do not oppose -- we do not object to the notice of

24  compliance and request for partial termination.  And that's

25  because the infrastructure process and outcome improvements,

1    Your Honor, that defendants have achieved we believe

2    represent truly significant system transformation in this

3    case, particularly when one looks at where the agency was

4    when the action was filed.  The system has been through

5    several governors and many -- several times more

6    commissioners in 16 years, and certainly periods of rapid

7    improvements and occasional setbacks.  We sought Court

8    intervention on several occasions throughout the life of the

9    case, which we can supplement for Your Honor, but in the big

10   picture, consistently the parties, with the active

11   involvement of the TAC, and the Court whenever necessary,

12   were able to address each time there was a request for court

13   intervention and actually resolve them with negotiated

14   remedies that were filed with the Court.

15            And so by meeting and sustaining these

16   140-some-odd improvements, we believe that the defendants

17   have met the durability requirements that the parties agreed

18   would be a prerequisite to them asking for a partial

19   termination of exit.  And I'd like to just in a few minutes

20   give the Court a sense, at least in a big picture sense, of

21   what these areas of improvements are so Your Honor can get a

22   context.  And again, happy to supplement -- and the

23   monitoring reports bring this to life both in terms of data

24   and qualitative assessments.  But we thought it might help

25   for the Court just to see what -- get a sense of what those

1 areas were that -- the well-being and improvements for

2 children have been achieved if that's okay.

3          THE COURT:  Oh, that would be perfect.  And just

4 so I'm following along, this is going to cover the benchmarks

5 from III to -- well, go ahead -- XV?

6          MR. LUSTBADER:  Right.  II through XIII.

7          THE COURT:  Oh, just XIII.

8          MR. LUSTBADER:  And Section 16.  And so -- the

9 detail underneath those is quite significant.  What I had

10 proposed to share with the Court was sort of a categorical

11 sense of the critical work of the Department in protecting

12 children that those sections capture.

13          THE COURT:  Okay.

14          MR. LUSTBADER:  And why achieving and sustaining

15 maintenance is a significantly -- worthy of exit achievement

16 as it's been measured.  And so those areas include -- just

17 sort of listing them -- reduced frontline case loads for the

18 workers and supervisors that protect and ensure the service

19 needs of children are provided in foster care, improved

20 training of staff, increased case worker visits of children,

21 improved and frequent assessments of children's needs, the

22 creation of a child and family team meeting model for the

23 ongoing involvement of children and families throughout their

24 experience with the Department and in family court, more

25 children in family settings and less use of institutions and

facilities to house children, more children placed closer to
their homes and communities of origin when they're removed
into foster care, children moved around less frequently and
matched and placed more appropriately to actually meet their
needs, an improved data system, Your Honor, as well as
improved fiscal management and quality assurance capacity and
the capacity for tracking and investigating child deaths when
those do occur, improved oversights over the administration
of psychotropic medications and the use of physical
restraints on children in custody in foster care, more kids
reunified with their biological families and reunified
faster, and for those kids who can't be reunified, more kids
achieving permanency, permanent homes, through adoption or
guardianship, children in foster care spending actually less
time in state custody and safely staying out of custody.  In
terms of family connections and wellbeing, increased
parent/child visits when my children are removed and brought
into state custody, more siblings being placed together, and
when they're not, visiting and otherwise connecting with each
other, heightened efforts, Your Honor, to address racial
disparities in the system, including the ability to track
outcomes by race, increase recruitment of African-American
homes, foster homes, the use of subsidized guardianship as an
alternative to terminating parental rights, and a more
diverse workforce and competency training for staff, also

better educational services in terms of children being served
in local community schools as opposed to very inappropriate
on-site schools, which were often attached to the use of
emergency shelters, which when we brought the case was really
the core array of housing for children.  There were sort of
large orphanage-style placements and a lot of emergency
shelters, and those have been shut down, and with them they
closed down a lot of these on-site schools, and children are
now served more with families and go to school in their
communities.  That was a big push with -- within the lawsuit.
And then, finally, improvements, Your Honor, in services to
help older youth live independently, including the use of
something called extended foster care, which allow children
once they reach the age of 18 to maintain in the custody --
in the services of the Department.

        So for -- in all these areas, Your Honor, the --
there is data and qualitative support in hundreds -- as you
know, hundreds of pages of monitoring reports.  But we think
they do warrant granting the partial exit that defendants
request.  Although that said, I want to underscore for the
Court how important plaintiffs' view, even if the Court is
inclined to grant partial termination of jurisdiction, how
important continued vigilance is for the class and the
services for parties and stakeholders and the Legislature to
ensure that the agency is appropriately resourced, Your

Honor, and able to address challenges going forward.  I think
the agency, as transformed as it's been, and as we fully
acknowledge that it is, and worthy of exit, is, in the TAC's
own words, far from perfect.  It's a very challenging agency
to run.  And there will be both current and future challenges
that beset it.  And so the question is always is there the
infrastructure and array of services and supports that it can
react to pressures going forward.

          And as the Court may be aware, there was one
recent challenge to that that was reflected in media reports
that had reported on a number of children who had to sleep
overnight in DCS offices because there was a -- a narrow
influx of some older kids coming into care in Davidson County
and they were unable to immediately meet the needs of those
kids.  And we've been working very frequently with both the
TAC and the defendants over the past quite a few weeks and --
to confirm that no other children have slept over night in
any kind of agency office and that the agency is on top of
that particular challenge, showing that it's poised to be
able to realign resources to deal with these kinds of
short-term or region specific challenges in the placement
population.

          And so based on our discussions with the
Department and the -- and the monitors, even with this most
recent challenge, we continue to believe the defendants'

request for a partial exit is entirely appropriate. And in their last monitoring report, I think the monitors reflect this need for continued vigilance going forward from all advocates and all sides in saying that the success of Tennessee's reform required years and continued focus and hard work by the DCS leadership, the front line staff, private providers, resource, parents, advocates, and consistent support for that work from Governor and the Legislature, Your Honor, and that sustaining and building on that success will require no less from all of those parties going forward, even if the Court does grant the partial termination and exit.

And I wanted to on behalf of plaintiffs, if it's okay, just take another minute or two --

THE COURT: Sure.

MR. LUSTBADER: -- to commend the work of DCS leadership. Over the years we've had a really transparent relationship agreeing most of the time, but not always, but always in moving the agency forward to address the challenge that beset it. And we do commend their leadership in reaching this point, especially the current DCS Commissioner, Bonnie Hommrich, her predecessor, Jim Henry, and the early work of Commissioner Viola Miller. They were instrumental in bringing the reforms forward to the point that they've reached today, and as well as the ongoing support of DCS by

1  the Governor.

2          We also commend the thorough and consistent work

3  of the TAC, the monitors in this case, Your Honor, in

4  assessing performance, providing the parties constant

5  technical assistance, and in helping the parties work through

6  concerns and even disputes, which allowed us to really

7  minimize the delay and expensive court intervention to very

8  few times over the 15 years.  We also very humbly recognize

9  the extraordinary service and vigilance of Judge Campbell in

10 this action, who really kept the parties accountable, saw

11 through the progress and helped address the setbacks, and

12 really kept this case so close in his sights for 16 years.

13 And I wanted to say that on the record, Your Honor.

14          THE COURT:  I wish he could have it in his sights

15 right now.

16          MR. LUSTBADER:  Finally, Your Honor, I wanted to,

17 if it's okay, personally recognize Daniele Cash, who is in

18 court today.  She's -- would you just stand up; waive to the

19 judge.  This extraordinary young woman was one of the

20 original named plaintiff children in this action.  And her

21 strength and perseverance while in foster care, and beyond as

22 a young adult, Your Honor, and in being able to see today's

23 action reach today's milestone at least in our jointly

24 presenting the readiness of the agency for this big step

25 really carries our deep gratitude and was worthy in our view

1  of recognizing to the Court.  It's really for her and others
2  like her that we brought this case in the first place.  And
3  also next to her, one more, Your Honor, is Ms. Juanita Veasy.
4  If you don't mind stepping up.  Ms. Veasy is the executive
5  director of the Black Children's Institute in Tennessee.  And
6  she was one of the original adult next friends way back when
7  we filed.  And I want to publicly thank her as well for her
8  extraordinary commitment to children and families and to this
9  case.  They've really been a huge value in informing the
10 process going forward and keeping everyone motivated towards
11 the end result.  So those are sort of my broad comments, Your
12 Honor.
13          THE COURT:  Sure.
14          MR. LUSTBADER:  And again, happy to fill it all
15 in.
16          THE COURT:  Well, first of all I guess for
17 Ms. Cash and Ms. Veasy, are you all satisfied with where we
18 are today?
19          MS. VEASY:  Yes and no.  I think they still have a
20 lot more work to do.  There are some concerns that we do
21 have, but I also think they have made enormous progress from
22 where we started, but still there are concerns, and I realize
23 that it's not perfect, but we need to work on it.
24          THE COURT:  All right.  Ms. Cash?
25          MS. CASH:  Yes, Your Honor, I am.

1          THE COURT:  Okay.  Well, I appreciate you all

2     being here.  That's important to the Court.  If we grant the

3     partial termination of jurisdiction and the exit plan, what

4     remains then of the Court's jurisdiction?

5          MR. LUSTBADER:  Section 19 --

6          THE COURT:  Okay.

7          MR. LUSTBADER:  -- Your Honor.  And that's the

8     creation and the functioning of the external accountability

9     center, which the parties have agreed -- and it's in the --

10    the joint filing that describes that it's comprised by the --

11         THE COURT:  Just to make sure that gets done and

12    funded?

13         MR. LUSTBADER:  That it's done and funded and

14    who's playing the role -- the external parties organizations

15    are the Chapin Hall Center for Children at University of

16    Chicago and Vanderbilt Center for Excellence here in

17    Tennessee.  They're collaborating and functioning as this

18    external accountability center.

19         THE COURT:  And where does the funding come from?

20         MR. LUSTBADER:  DCS.

21         THE COURT:  Okay.  That's what I thought.

22         MR. LUSTBADER:  Yeah.

23         THE COURT:  Well, one thing -- and -- that will be

24    helpful after this -- and you've sort of begun that process

25    at a high level -- but maybe in a filing do it a little bit

more detailed level with citations to the docket entries as a
chronology of the case up to this point.  In particular --
you can tell I had some questions about the class --

           MR. LUSTBADER:  Uh-huh.

           THE COURT:  -- and what relief they're seeking and
how they were -- how we got their input.  I don't know --
I'll leave it to you all to determine what I need to know
about the various developments from the Technical Assistance
Committee.  I don't need to get terribly into the weeds, but
I gather -- and maybe I am still not hearing this right --
that there has been over the years a progression of progress.

           MR. LUSTBADER:  Indeed.

           THE COURT:  And maybe in your filing you can just
outline that to me with docket entries to I guess the
technical assistance annual report.

           MR. LUSTBADER:  That's exactly right, Your Honor.

           THE COURT:  So I can go back and look.

           MR. LUSTBADER:  And so what I'm understanding, and
please let me know if I got this right.  But perhaps a way of
chronologically showing the number, the quantum, of
obligations that increasingly came into maintenance over
time.

           THE COURT:  Right.

           MR. LUSTBADER:  How that steadily built trend-wise
until we got to this point.

```
 1              THE COURT:  Right.  And I guess all of this
 2    started -- and we sort of figured that part out -- with
 3    the -- maybe it's Document 190, way back.  The -- I think
 4    that's the -- yeah.  The stipulation of settlement of
 5    contempt motion.  But prior to that there was a settlement
 6    agreement.
 7              MR. LUSTBADER:  The settlement agreement was in
 8    2001.  And then the -- there was an initial period of less
 9    than progress, Your Honor, that led to the contempt motion in
10    around '03, and that was resolved in '03 and '04 with some
11    refined obligations.
12              THE COURT:  So does everything that we've done --
13    you all have done, rather, stemmed from Document 190, and
14    that's the stipulation of settlement of contempt motion?
15              MR. LUSTBADER:  I would say everything that's been
16    done begins with that 2001 consent decree.  And then the --
17    the contempt motion was an enforcement proceeding that
18    resulted in some early modifications and some remedies.  And
19    there have been a few other points where there have been some
20    other modifications and remedies.
21              THE COURT:  And --
22              MR. LUSTBADER:  But throughout --
23              THE COURT:  And when you say the 2001 settlement
24    agreement -- I don't know if you have it -- is that Document
25    109?
```

 1              MR. LUSTBADER:  I can't confirm it here.

 2              THE COURT:  Okay.

 3              MR. LUSTBADER:  But I will in a post filing, Your

 4     Honor.

 5              THE COURT:  Let's pass -- let me pass -- if the

 6     court officer can pass this to him.  Just -- this is my copy.

 7     I just want to make sure I've got the right one.  That's the

 8     document from which everything flows?  No?

 9              MR. LUSTBADER:  Yes.

10              THE COURT:  Good.

11              MR. LUSTBADER:  Yep.  Yep.

12              THE COURT:  Okay.  I'll have that back.  Okay.

13     Thanks.

14              All right.  Thank you.

15              MR. LUSTBADER:  Thank you.

16              MR. LAKEY:  Good afternoon, Your Honor.

17              THE COURT:  Good afternoon.

18              MR. LAKEY:  Again, my name is Jonathan Lakey and

19     I'm one the attorneys representing the State defendants in

20     this case, and General Alexander Rieger is with me at counsel

21     table.  And I wanted to take a moment, with the Court's

22     indulgence, to introduce you to Commissioner Bonnie Hommrich.

23              THE COURT:  Glad to have you here.

24              MR. LAKEY:  Commissioner Hommrich has been

25     involved in this area of work -- this has been her life

1    passion -- both in Tennessee and other states before

2    Tennessee.  And she's been the Commissioner I think since

3    August 2015.  And really we have made great strides under her

4    leadership and her predecessor, Jim Henry, who is now chief

5    of staff to Governor Haslam.  And they both deserve a lot of

6    credit for the progress that has been made.

7            I wanted at the outset just say that I didn't have

8    any issue or disagreement with what Mr. Lustbader said in

9    regard to maintenance or any of the questions you posed to

10   him.  And it's a reflection, I think, of how the parties

11   have, certainly over the last five years, tried to work

12   together to make progress on this case.  Because while

13   we're -- we urgently, obviously, want to end federal

14   oversight of a state department, and as any department would

15   want to do, most importantly, we -- we want to do that

16   because it's a reflection that DCS is providing the critical

17   services it provides to some of our most vulnerable children

18   in the State at a level of professionalism that has been

19   recognized by some really strong advocates and really strong

20   monitors.  And so, you know, I always have tried to keep that

21   in mind as the attorney for the State, that at the end of the

22   day, progress in reaching the milestone of having the Court

23   terminate its jurisdiction is a reflection of the services

24   that are being provided by DCS to the children that it

25   support.  And I may go over some of the things that

1  Mr. Lustbader did and touch upon them, but I'm going to jump

2  around a little bit based on the things that he's talked

3  about.  But we are here obviously today -- and there's really

4  two things that are in front of the Court.  One is to ask the

5  Court for the approval of the 2017 exit plan.

6           THE COURT:  That's the joint -- that's Document

7  579.

8           MR. LAKEY:  That's exactly right, Your Honor.

9           THE COURT:  Okay.

10          MR. LAKEY:  So that's one thing.  And what -- and

11  I'll have to admit to the Court, I didn't get involved in

12  this case until 2012.  So Mr. Lustbader has got me beat by a

13  large margin.  But since we -- since I've been involved, what

14  has happened is we've made that presentation, and generally

15  what Judge Campbell would do, would actually just reenter the

16  exit plan with his signed version.  And you probably have

17  seen that in the prior docket history.

18          THE COURT:  And I guess -- I was going to ask

19  you -- and then the other item before the Court is Document

20  Number 583.

21          MR. LAKEY:  Yeah.

22          THE COURT:  Which is not styled as a motion.  And

23  you may want to correct that.  But I think what you want me

24  to do is to enter some version of 583-1.

25          MR. LAKEY:  That's right.  And so it's styled the

1    way it is just to technically comply with the provision of
2    the exit plan, Section 18D2, if I remember correctly --
3    although I have to double-check that.  Section 18D2 tells us
4    what to do once the required provisions have been in
5    maintenance for 12 months.  We were supposed to file a notice
6    of compliance and attach to it a proposed order, which is why
7    we actually -- we attached the proposed order.  But I
8    certainly can restyle it as a motion for purposes of -- of
9    allowing the Court to enter an order since that's how we
10   speak to the Court normally.
11           THE COURT:  And I think -- maybe you can do it as
12   a joint motion and then maybe style it under Rule 23 because
13   what you're really asking me to do is enter final -- no.
14           MR. LAKEY:  No, because we are --
15           THE COURT:  I was going to say final permanent
16   injunctive relief under Rule 23.
17           MR. LUSTBADER:  Your Honor, it would be an order
18   approving partial termination of jurisdiction over those
19   sections.
20           THE COURT:  Except for 19.
21           MR. LAKEY:  Except for Section 19.  That's exactly
22   right.
23           MR. LUSTBADER:  Based on performance, not as a --
24   not as a settlement or compromise of the obligations, but
25   based on the agency's performance, asking the Court to enter

```
 1  an order saying they've partially terminated jurisdiction
 2  over all of those provisions except for 19.
 3            THE COURT:  But couldn't -- can't -- the only
 4  thing before -- well, how can I -- what's -- what's -- isn't
 5  Rule 23 the reason I can do this?
 6            MR. LUSTBADER:  Well, 23 allowed the -- the
 7  consent decree to begin and the class, obviously, to feed
 8  the -- the jurisdiction to do that.
 9            THE COURT:  And everything's flowing from that
10  document.
11            MR. LUSTBADER:  Everything flows from the consent
12  decree, and then the request is to peel off, as it were,
13  jurisdiction over a large chunk of that consent decree
14  jurisdiction-wise because of performance.
15            THE COURT:  Uh-huh.
16            MR. LUSTBADER:  And then just keeping that one
17  other item.
18            THE COURT:  Well, then -- this was my next
19  question.  What's the level of my review here then?
20            MR. LUSTBADER:  (Indicating)?
21            THE COURT:  What's my standard of review?  Because
22  I thought it would be under 23.  But sounds like you're
23  not -- what's the standard of review for me to approve this?
24            MR. LAKEY:  Respectfully, Your Honor, I think
25  it's -- it's almost a self-effectuating settlement agreement
```

1  and exit plan, which was approved at the outset by the
2  District Court, and calls for the Court to terminate its
3  jurisdiction upon the performance that the State has now --
4  has now demonstrated.
5          THE COURT:  Well, then you can lay that out in
6  your chronology.  And please give me some legal authority.
7          MR. LAKEY:  Yes, Your Honor.  Shall do.
8          THE COURT:  Okay.
9          MR. LAKEY:  And -- and so -- and I know the
10 Court -- having -- having joined this case midstream and been
11 well into the docket history at the time I came in, I
12 understand the -- what the Court is going through in regard
13 to -- to ensuring itself in regard to the -- through the
14 relief that's requested.
15         THE COURT:  And I don't doubt -- like I said in
16 the beginning, you all have worked incredibly hard over the
17 years and made incredible process.  And it's to be
18 complemented.  I still have to exercise the appropriate --
19         MR. LAKEY:  Right.
20         THE COURT:  -- review and independent judgment
21 here.
22         MR. LAKEY:  Without a doubt.
23         THE COURT:  Okay.
24         MR. LAKEY:  And so in many ways I think where we
25 are today kind of, in some respects, dates back to the

modified settlement agreement and exit plan that was entered
in 2010, I think in November of 2010, at ECF Number 411,
which I think set forth the actual provisions we're operating
under today.  And as Mr. Lustbader said, there's about -- in
the required provision that we had to come into substantial
compliance with, or maintenance, as the term has been used in
this agreement, there's about 136 of those.  So it's
pretty -- it's a pretty taxing agreement.  So between 2010
and today, there have been a series of revised exit plans
filed and approved by the Court, mostly on an annual basis,
but there was one year that was skipped.  And then the relief
that we're seeking today primarily rests from the approval of
the 2016 exit plan to where we are today.  And so that's
where my focus will be just real briefly.

      As is set forth in the 2016 exit plan, which I
think you've already referenced, but is at Docket 555 --

      THE COURT:  Uh-huh.

      MR. LAKEY:  -- defendant's obligations really are
two to get the relief that we're seeking.  And the first is
to come into full maintenance with the provisions of Sections
2 through 13 and Section 16.  The April 2016 exit plan
establishes on its face that we did that.  Because when you
look at it, you'll see maintenance by every of those
provisions, and that was approved by Judge Campbell.  That's
step one.  The second step then is the 12 consecutive months

1  of holding that maintenance.  And that's where we are today,

2  and respectfully submit we've achieved.  Now, the status --

3          THE COURT:  And the monitors have confirmed that?

4          MR. LAKEY:  That's right.  And that's what I was

5  going to point to.  So where does the basis come from?  So

6  the defendant's activities have been closely monitored by the

7  Technical Assistance Committee, the TAC, and plaintiffs'

8  counsel.  And as Mr. Lustbader said to you, and truly when I

9  first got involved, I was surprised as a lawyer -- you can

10  imagine my reaction as a defense attorney -- to find out that

11  TAC is actually embedded in their offices.  They have offices

12  right next to DCS staff.  They have access to their system.

13  They can interview anybody they want.  They had realtime

14  information.  And while I had a kind of a reflex to that, it

15  worked because of the joint efforts to try to make sure the

16  system was doing what it needed to do.  But it also, I think,

17  should provide the Court with some comfort to know that the

18  TAC wasn't simply relying on information we provided to it.

19  It's getting the information directly and on a daily, ongoing

20  basis.  And so it's both their reports that I think are

21  important to the Court and then the prior exit plans that

22  showed the maintenance status that was approved by Judge

23  Campbell.

24          THE COURT:  And the progress over those years?

25          MR. LAKEY:  Over the years, Yes, Your Honor.  And

as you've already pointed out, we can set that out in a chart
or somehow make sure that's reflected so it's easy to follow.
Especially since there are so many docket entries.

        But the 2016 exit plan certainly from DCS's
perspective, from say defendants' perspective was a milestone
for us, because that exit plan, which was based on the TAC
reports about our -- about our efforts in 2015 -- and those
TAC reports are -- I think they were filed -- let me see --
I've got a note on that.  I'll find that.  Oh, the TAC
reports were -- were filed at 552-1 and 554-1.  They provided
the support for a finding of maintenance in the 2016 exit
plan as to all of the required provisions.  Having come into
main -- and one other point to be really clear about.  And
Mr. Lustbader already touched on this.  The TAC reports and
the parties' joint stipulation in the filing and the
statements we made before Judge Campbell when he approved the
2016 exit plan made it very clear that maintenance had been
achieved on or about December 31, 2015.  That started the
clock ticking.  Remember the TAC reports of early 2016 were
based on 2015 information.  So having come into maintenance
by 12/31/2015, under Section 18D2 of the exit plan, the 2016
exit plan, and all the ones before that, we had to sustain
maintenance for 12 consecutive months, and then we would be
in a position to file the notice of compliance and seek the
order of partial dismissal.

1          And as the Court has already said, and as
2    Mr. Lustbader has said, just like we did in regard to 2016,
3    ultimately, here, the parties, the TAC, all agree that --
4    that the defendants have maintained or sustained maintenance
5    for the year 2016.
6          So from that December 31, 2015 date through
7    December 31, 2016, there is no dispute among the parties or
8    the TAC that the State was in maintenance with all the
9    required provisions of Sections 2 through 13 and Section 16.
10   And what I really wanted to note for you is, I think that is
11   made clear in at least four different places that I wanted to
12   give the Court a reference to today.  One is the TAC reports
13   of April 4, 2017 and May 16, 2017 that Mr. Lustbader referred
14   to, which are ECF576-1 and 578-1.  Then I think it also is
15   made clear by the parties' joint stipulation to approve the
16   2017 exit plan, to which the 2017 exit plan is attached.  And
17   when you look at the 2017 exit plan, you see maintenance by
18   each provision.  And that is I believe at ECF579.  And then
19   you have the actual 2017 exit plan that we've asked the Court
20   to enter, which is 579-1.  And then, finally, it's the notice
21   of compliance.  And again, I appreciate, you know, the -- CRI
22   has been a -- a diligent plaintiff counsel to work with.
23   They ask for information on a regular basis.  They dig into
24   information.  And I'm -- I'm really pleased that we've been
25   able to ultimately reach agreement and not have disputes, and

1   that continues and is reflected in the notice of compliance,

2   where -- and as Mr. Lustbader has said today, that it has --

3   they have no objection to the entry of the proposed order.

4   So that -- I think for purpose -- I think a broad picture is

5   important, obviously, for the Court to understand the context

6   of where we are today, but -- and then I think what is

7   operable for purposes of the order we're seeking is really

8   found from the entry of the exit plan in 2016 to where we are

9   today.

10             THE COURT:  Okay.

11             MR. LAKEY:  And so we'll certainly make sure

12   that's clear in the -- in the post briefs.

13             THE COURT:  And I follow everything you're saying.

14   And just to be clear, and we'll put it in the order, your

15   post hearing filing will set forth what the scope of

16   review --

17             MR. LAKEY:  Sure.

18             THE COURT:  -- is for me here and my authority to

19   do it.

20             MR. LAKEY:  Yes, Your Honor.  Yes, Your Honor.

21             THE COURT:  And then on page 23 of 579-1 about --

22   what is the focus team?  Give me a little bit of

23   understanding about that.

24             MR. LAKEY:  I'm sorry.  Can you give me that

25   reference again?

THE COURT: "The focus team will ensure that all children and youth entering full guardianship each month will be reviewed to determine whether or not these children or youth have a permanent family identified and that the needed supports and services are in place to ensure timely permanency."

MR. LAKEY: Your Honor, may I let Commissioner Hommrich answer that because she certainly can give you a better answer that I can.

THE COURT: If you want to come to the podium, that's fine.

COMMISSIONER HOMMRICH: My name is Bonnie Hommrich, and I'm the Commissioner for the Department of Children's Services.

The focus team was designed to address those children who came into our full guardianship but who did not have an identified family. And so that team meets once a month with regional representatives, and they look -- they endeavor to assure that each child that hasn't got an identified forever family, that there are three primary tasks that they're constantly doing. They're doing what we call archeological digs. And what that means is they are searching for any significant family, significant teacher, somebody important in this child's life that would consider becoming their permanent forever family. So the

archeological dig is one.  An active child and family team is another element of this.  And that -- our whole process is called child and family team teaming.  And again that means that you bring all those people that care deeply about these children to the table and keep trying to find permanency for the kids.  And then the third element is a robust recruitment plan so that -- in some children you -- you may need to find people outside of their current team.  You may be able to find a family in Idaho or Montana that would be willing.  So you've got to constantly do that robust recruitment to use every avenue.  All three of those together have to be constantly worked.  Does that -- is that helpful?

THE COURT:  No, that's helpful.  Thanks.

MR. LAKEY:  And to that point, Your Honor, I think one of the things that has been really tremendous that DCS has accomplished is return to permanency.  You know, you -- you don't want -- you want, when a child is in foster care, obviously to be safe, to receive the appropriate services, but the goal is reunification, reunification with the family where possible, and if not the family, to make that decision and then to get the child into a permanent situation so that they can move forward with their life in that permanent situation.  The State has done a tre- -- I think that is one of the things that I know DCS is most proud about.  The -- the evolution of that system and where it is today and it's

 1   been reflected I think fairly nationally that Tennessee's a
 2   leader in that area, and that's great.
 3            THE COURT:  And is that an example of what the TAC
 4   came up with, Mr. Shookoff and Ms. --
 5            MR. LAKEY:  I don't -- I think the TAC has had
 6   impact on a lot of different areas, whether it was that
 7   particular one -- I can't imagine that they didn't have input
 8   on it but --
 9            COMMISSIONER HOMMRICH:  I guess what I would say
10   is, if -- some of this comes out of all the robust discussion
11   between the plaintiffs and the TAC and the Department.
12            THE COURT:  Okay.
13            MR. LUSTBADER:  That's correct, Your Honor.  It's
14   sort of -- on that particular item, the issue that it was
15   designed to address, when we filed the case, were preventing
16   kids from languishing in state custody.  And then when the
17   Commissioner refers to full guardianship, those are children
18   for whom their parents rights have been terminated but they
19   still don't have a permanent home.  And so that's a
20   particularly urgent area.  You want to focus returning to
21   family and repairing family at the front end, and if that's
22   not possible we don't want children growing up in foster
23   care.  And so that that process was something that was
24   informed by the TAC and best practice and owned locally by
25   the Department of Children's Services as a process to get

that rapid permanency result for that group of kids who they've terminated their parents' rights. And so there's one where there's both this process of the focus that you refer to and their actual outcomes with percentages tied to, for example, how quickly after a child is in full guardianship and their parents' rights have been terminated, how rapidly they achieve a permanent home and what percentage of children in that situation achieve that desirable goal. And they've met that goal. And so it's sort of a -- a good illustration, Your Honor, of a combination of between a process and an outcome to achieve a better result for kids.

THE COURT: Okay. And then -- and this may be my last question. How did you all end up with Chapin Hall -- and I thought Vanderbilt was part of this, too, the accountability center.

MR. LAKEY: So Chapin Hall --

THE COURT: Chapin?

MR. LAKEY: Yeah, Chapin. Chapin Hall has been involved with providing reports and information and studying the information from DCS for years and years. And they're an important partner not only to provide information to the State, but they've been providing information along the way that the TAC relies upon in their report. So they were a natural to go to. And then the Vanderbilt Center of Excellence is working with Chapin Hall. And again, that is

an entity that DCS has used on a fairly regular basis and is
very familiar with the DCS system.  And we thought that
since -- I think Chapin Hall is out of Chicago, if I remember
correctly.  And we wanted to make sure there was a local
presence as part of that external accountability reporting
center that's required under Section 19.  And I think
Mr. Lustbader said this.  If not, he certainly implied it.
And it's true.  I mean, that -- that external accountability
center is -- we've been -- we've had a lot of conversations
with the TAC, and we've had a lot of conversations with
plaintiffs' counsel and directly with the accountability
center and all those groups together to get it ready to go.
And it's established and ready to go once the -- once the
order's entered, because that 18 months of its work is tagged
to the date of the entry of that order.

          THE COURT:  All right.

          MR. LAKEY:  Thank you, Your Honor.

          THE COURT:  All right.  Anything else?

          MR. LAKEY:  No, that is it.

          MR. LUSTBADER:  Your Honor, just for clarity
sake --

          THE COURT:  Sure.

          MR. LAKEY:  -- so you can refer to it.  Document
579, paragraphs 3 through 8 spell out what Chapin Hall's role
is -- has been in the case.  And why the parties and the TAC

felt they were best suited.  And then Exhibit E describes --
I'm sorry -- Exhibit B to 579 literally describes what the
reporting structure would be and their role is.

THE COURT:  Right.  I saw that.  Okay.  Well, what
I want to do is give you all time to make the submission.
And I guess it's a little hard for you to determine how much
time you're going to need.  So I'm going to just set -- but
if you need more time, obviously the -- if you want to file
things before this date -- and I'm going to just pick June
the 22nd if that works.

I would ask that you turn documents 583 and 579
into motions, maybe joint motions, so I've got something to
act on.

And then I'll also add to the order a chronology
of the case to this point with reference to the docket
entries.  And again I just need -- give me a chronology and
reference me to the docket, and then I can go there and get
the details.  But just tell me why you all think that's. . .
And then a -- I need a little bit better understanding --
because this case is actually so old, it's not all on the
computer system -- you know, where was the class certified,
what is the definition of the class, and notice was given,
obviously, to the class, and whose been representing it.  I
guess they've been going in and out.

And then as I indicated, what's my -- what's the

 1  scope of my review of these motions you're going to file, and
 2  what's my authority to enter it, if it's not Rule 23, which
 3  seems to me to be the one.  And, of course, you can except
 4  out paragraph 19 if there's some future -- and then anything
 5  else that will help me rule on this.
 6            I will say, I apologize that you've had to sort
 7  of, you know, go back and relive the last 17 years, but it's
 8  been incredibly helpful for me.  I've got a much better
 9  understanding and comfort than I did before an hour
10  and-a-half ago.  So it's -- for me it's been time well spent.
11  Anything else?
12            MR. LUSTBADER:  No, Your Honor.
13            MR. LAKEY:  No, Your Honor.
14            THE COURT:  All right.  Thank you.
15            (Court adjourned.)
16
17
18
19
20
21
22
23
24
25

 1   REPORTER'S CERTIFICATE

 2

 3           I, Lise S. Matthews, Official Court Reporter for

 4   the United States District Court for the Middle District of

 5   Tennessee, with offices at Nashville, do hereby certify:

 6           That I reported on the Stenograph machine the

 7   proceedings held in open court on June 8, 2017, in the matter

 8   of BRIAN A., et al., v. WILLIAM HASLAM, et al., Case No.

 9   3:00-cv-00445; that said proceedings in connection with the

10   hearing were reduced to typewritten form by me; and that the

11   foregoing transcript (pages 1 through 44) is a true and

12   accurate record of said proceedings.

13           This the 12th day of June, 2017.

14

15                           /s/ Lise S. Matthews
                             LISE S. MATTHEWS, RMR, CRR, CRC
16                           Official Court Reporter

17

18

19

20

21

22

23

24

25