# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| BRIAN A., et al. ) | |
| ) | |
| Plaintiffs, ) | Civ. Act. No. 3:00-0445 |
| ) | Judge Waverly D. Crenshaw, Jr. |
| v. ) | Magistrate Judge Joe B. Brown |
| ) | |
| BILL HASLAM, et al. ) | |
| ) | |
| Defendants. ) | |

## JOINT MOTION FOR AN ORDER PARTIALLY TERMINATING JURISDICTION AND PARTIALLY DISMISSING CASE WITH PREJUDICE

Pursuant to this Court's June 8, 2017 Order (Dkt. No. 585) and the June 8 status conference (Transcript, Dkt. No. 586), the parties in this matter hereby respectfully submit this Joint Motion for an Order Partially Terminating Jurisdiction and Partially Dismissing Case with Prejudice ("Joint Motion"), in accordance with the express terms set out in the approved and entered consent decree known as the April 2016 Modified Settlement Agreement and Exit Plan ("2016 Exit Plan," Dkt. No. 555), which governs the parties' obligations. Pursuant to the express terms of the 2016 Exit Plan, a [proposed] Order Partially Terminating Jurisdiction and Partially Dismissing Case with Prejudice was filed with this Court on June 6, 2017 (Dkt. No. 583-1); the parties will submit an editable version to the Court.

Also pursuant to this Court's June 8 Order, this Joint Motion provides the Court: (1) a synopsis of the case and chronology citing significant case developments, including citations to the docket and a description of class action developments; (2) a history of the progress of

compliance with the terms of the settlement agreement; and (3) the scope of review identifying the Court's legal authority to grant this motion.

As set forth fully below, the parties submit that this Joint Motion should be granted.

## INTRODUCTION AND SYNOPSIS

Plaintiffs filed this federal civil rights class action pursuant to 42 U.S.C. § 1983 on May 10, 2000, seeking solely declaratory and injunctive relief on behalf of a putative class "consisting of all foster children who are or will be in the custody" of the Tennessee Department of Children's Services (Dkt. No. 1, ¶ 1). Initial named Plaintiffs included eight children in foster care in the custody of the Tennessee Department of Children's Services ("DCS" or the "Department"), each appearing by an adult next friend (Dkt. No. 1, ¶¶ 26, 28-41); six others were added later in the litigation (Dkt. Nos. 342, 343, 344, 345).

The Complaint (Dkt. No. 1) alleged federal constitutional and statutory claims on behalf of Plaintiffs and the putative class against then-Governor Sundquist and then-DCS Commissioner Hattaway in their official capacities (Dkt. No. 1, ¶¶ 1, 42-43). Claims were asserted under the First and Ninth Amendments of the United States Constitution, the substantive and procedural due process clauses of the Fourteenth Amendment, the Adoption Assistance and Child Welfare Act of 1980 (as amended by the Adoption and Safe Families Act of 1997), the Americans with Disabilities Act, the Rehabilitation Act of 1973, Title VI of the Civil Rights Act of 1964, and federal common law (Dkt. No. 1, ¶¶ 63, 65-68).

The Complaint alleged that the child welfare system administered by the Department was "grossly mismanaged and overburdened" (Dkt. No. 1, ¶ 3) and that "Defendants' failure to protect foster children in DCS custody and provide them and their families with appropriate, legally required services ha[d] harmed these children and endangered their safety, sense of stability[,] and

2

developmental well-being" (Dkt. No. 1, ¶ 7). The Complaint also faulted Defendants for failing to take reasonable steps to safely reunify children with their families or find them a suitable adoptive or other permanent home (also referred to as achieving "permanency")(Dkt. No. 1, ¶ 8). The Complaint further alleged that a "lack of appropriate foster care placements" led to children being placed in "overcrowded, emergency shelters" and a gross overuse of inappropriate orphanage-style group facilities and institutions with poor on-site schools (Dkt. No. 1, ¶¶ 7, 52, 157, 164). The Complaint alleged that children routinely languished in state care for years or their whole childhoods, "moved from one inadequate placement to another without appropriate services," were placed "at great distance from their parents and siblings," and were thus deprived "of important family ties" (Dkt. No. 1, ¶¶ 3, 169, 172). The Complaint also alleged disparate placement and permanency outcomes and services for African American children in state custody (Dkt. No. 1, ¶ 4). The Complaint concluded that these alleged deprivations resulted in children failing to receive "any meaningful opportunity for a stable, caring home or the legally required services that provide the life skills necessary for them to live independently" (Dkt. No. 1, ¶ 3).

On July 27, 2001, Judge Campbell approved a settlement agreement between Defendants and Plaintiffs and entered a consent decree that committed the State to a multi-year comprehensive reform process to overhaul its child welfare policies, practices, and outcomes for children, youth, and families (Dkt. Nos. 109, 112 (the "Settlement Agreement" or "consent decree")). Pursuant to the Settlement Agreement, the Court certified a class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) defined as "[a]ll foster children who are or will be in the legal custody of the Tennessee Department of Children's Services . . . excluding children . . . in [DCS custody] upon an allegation or adjudication of a delinquent or criminal act" (Dkt. No. 109, Section I.B, at p. 6).[1]

---

[1] Citations are to page numbers in the original documents, not to page numbers in file-stamped versions.

Case 3:00-cv-00445   Document 587   Filed 06/22/17   Page 3 of 25 PageID #: 16509

Since 2001, the Court has approved several stipulated modifications to the consent decree in accordance with the findings of neutral court-appointed monitors known as the Technical Assistance Committee (the "TAC"). (*See* Dkt. No. 109, Section XIV, at pp. 37-38.) The monitors have also hired staff embedded within DCS reporting directly to the monitors, with full access to agency staff, data systems, case files, and reporting to support the monitors' evaluation of DCS' performance. (*See* Dkt. No. 109, Section XV, at pp. 38-40.)

Following nine years of some setbacks, but ultimately solid progress, the TAC reports supported and the Court approved and entered a negotiated Modified Settlement Agreement and Exit Plan on November 10, 2010 (the "2010 Exit Plan," Dkt. No. 411). The 2010 Exit Plan required Defendants to comply with approximately 140 improvement benchmarks and then sustain that compliance for a full year (Dkt. No. 411). Compliance was termed "MAINTENANCE," meaning that if Defendants maintained or improved performance sufficient to meet the terms of the provisions as reported by the TAC, such performance "shall be considered substantial compliance for purposes of Termination and Exit" (Dkt. No. 411, Section I.D.2, at p. 6).

Under the 2010 Exit Plan, the TAC was to evaluate, monitor, and report on the Department's progress in scheduled monitoring reports. (*See* Dkt. No. 411, Section XV.A, at p. 28.) After the release of each monitoring report, the parties and the TAC were tasked with conferring and negotiating as to which provisions were in MAINTENANCE (Dkt. No. 411, Section XVIII.C.3, at p. 34). If, despite negotiations, the status of MAINTENANCE on any item remained in dispute, the TAC was given the express authority to resolve the dispute; its decision would be "final, binding, and unappealable by the parties" (Dkt. No. 411, Section XVIII.C.2, at p. 34). Once the MAINTENANCE determination was complete, the parties would jointly file a proposed modification to the 2010 Exit Plan that the Court would then be asked to approve—thus

4

closely tracking progress towards full compliance and exit (Dkt. No. 411, Section XVIII.C.3, at p. 34).

Once Defendants were able to meet and sustain all 140 benchmarks for 12 months (which specifically included the obligations in Sections II through XIII and XVI of the 2010 Exit Plan (the "Required Provisions"), Defendants could file with the Court a motion for partial exit known as the "Notice of Compliance and Proposed Order Terminating Jurisdiction" (Dkt. No. 411, Section XVIII.D.2, at p. 34). Upon entry of the proposed Order, the final phase of the settlement agreement would begin. The consent decree provides that the Court would retain jurisdiction only over Section XIX of the 2010 Exit Plan for 18 months (Dkt. No. 411, Section XIX.B, at p. 35). Section XIX requires Defendants to fund and develop an external accountability reporting center "to report publicly on DCS' maintenance of program, policy[,] and practice improvements" (Dkt. No. 411, Section XIX.A, at p. 35). At the end of the 18-month period, the 2010 Exit Plan provides that "Defendants shall file an unopposed Notice of Compliance with this Section XIX and a Proposed Order terminating jurisdiction over . . . Section [XIX]" (Dkt. No. 411, Section XIX.D, at p. 35).

Over the last several years, the pace of this action has accelerated, culminating in a status conference on April 11, 2016, where the Court entered the 2016 Exit Plan finding that Defendants had achieved MAINTENANCE over all provisions of the Settlement Agreement by December 31, 2015 (Dkt. No. 555). The TAC recently completed its fifteenth Monitoring Report, filed on April 4, 2017 (Dkt. No. 576-1), and a Supplement filed May 15, 2017 (Dkt. No. 578-1),[2] concluding that

---

[2] For several of the 15 monitoring reports, the TAC filed supplemental reports providing additional information and clarification (*see, e.g.*, Dkt. Nos. 471-1, 525-1, 539-1, 546-1, 554-1, 578-1). In addition, the TAC has filed three reports related specifically to concerns raised about TFACTS, the Department's automated information system: The Report of the *Brian A.* Technical Assistance Committee on its Evaluation of TFACTS (Dkt. No. 484-1, April 2, 2013); Update on Developments Related to the TFACTS Evaluation Findings and Recommendations (Dkt. No. 498-1, September 17, 2013); and Update on Developments Related to the TFACTS Evaluation Findings and Recommendations (Dkt. No. 521-1, June 11, 2014).

5

"in the 12 months that have passed since December 31, 2015, the Department has maintained its overall level of performance in the areas covered by the Settlement Agreement" (Dkt. No. 576-1, at p. 2).

Based on these reports, on May 16, 2017, the parties filed a Joint Stipulation Seeking Court Approval of Proposed April 2017 Modified Settlement Agreement and Exit Plan (the "Parties' Joint Stipulation," Dkt. No. 579) and the April 2017 Modified Settlement Agreement and Exit Plan (the "2017 Exit Plan") (Dkt. No. 579-1). That submission is pending before the Court.

Also pending before the Court, pursuant to Section XVIII.D.2 of the 2016 Exit Plan governing this matter, is Defendants' Notice of Compliance with Modified Settlement Agreement and Exit Plan (Dkt. No. 583) and the proposed Order Partially Terminating Jurisdiction and Partially Dismissing Case with Prejudice (Dkt. No. 583-1), both filed on June 6, 2017. Plaintiffs do not oppose the entry of the requested order.

This Joint Motion, at the direction of the Court at the June 8, 2017 status conference, further supports the Notice of Compliance and Proposed Order (Dkt. Nos. 583 and 583-1).

As set forth at the status conference on June 8, 2017, and in this Joint Motion, the parties are in agreement and request that this Court: (1) find that Defendants' performance as of December 31, 2016 (as reflected in the TAC reports (Dkt. Nos. 576-1, 578-1) and the Parties' Joint Stipulation (Dkt. No. 579)) establishes that Defendants have sustained MAINTENANCE on all obligations in Sections II through XIII and XVI for 12 months; (2) enter the proposed 2017 Exit Plan (Dkt. No. 579-1); and (3) grant this Joint Motion and issue an order granting partial termination of jurisdiction over all obligations under the 2017 Exit Plan except for Section XIX concerning the External Accountability Reporting Structure.

As discussed more fully below, the Court's scope of review of this Joint Motion is its plenary authority to enforce the validly entered consent decree on behalf of the Rule 23 certified Class, under the express terms of the most recent consent decree, the 2016 Exit Plan, approved and entered by Judge Campbell in April 2016 (Dkt. No. 555).

## I.  CHRONOLOGY OF CASE; CLASS ACTION DEVELOPMENTS

Along with the Complaint, Plaintiffs contemporaneously filed a motion for class certification (Dkt. Nos. 4, 5). Defendants moved to dismiss this case on August 1, 2000 (Dkt. No. 19), which motion was granted in part and denied in part by the Court (Dkt. No. 45).[3] The Court subsequently ordered mediation to pursue possible settlement (Dkt. Nos. 52, 56, 57, 59), and denied Plaintiffs' motion for class certification without prejudice to renew following the completion of mediation (Dkt. No. 59).  Mediation was successful, and on July 27, 2001, the parties entered into a Settlement Agreement approved and entered by the Court that set standards to improve DCS infrastructure, oversight processes, and outcomes for the Class (Dkt. Nos. 109-112). As part of the Settlement Agreement, the Court certified a Class of "[a]ll foster children who are or will be in the legal custody of the Tennessee Department of Children's Services . . . excluding children . . . in [DCS custody] upon an allegation or adjudication of a delinquent or criminal act" (Dkt. No. 109, Section I.B, at p. 6; *see also* Dkt. No. 1, ¶¶ 18-27 and Dkt. No. 112).[4]

---

[3] Judge Campbell's opinion is reported in *Brian A. ex rel. Brooks v. Sundquist*, 149 F. Supp. 2d 941 (M.D. Tenn. 2000), in which the Court held that: (1) provisions of the Adoption Assistance and Child Welfare Act requiring a written case plan with mandated elements, a periodic review system, and a State plan providing for establishment of a State authority responsible for maintaining standards for foster family homes and child care institutions created enforceable rights under 42 U.S. § 1983; (2) the complaint stated a claim for racial discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, *et seq.*; (3) the class of foster care children adequately alleged conduct by Tennessee officials establishing violations of substantive due process rights; and (4) the complaint stated a claim for deprivation of rights without procedural due process. The Court dismissed Plaintiffs' claim under the Americans with Disabilities Act. *Id.* at 949.

[4] Pursuant to Fed. R. Civ. P.  23(e), after granting preliminary approval, including the form and manner of notice to the Class and a schedule for filings in connection with final approval (Dkt. Nos. 69, 70), the Court held the requisite fairness hearing on July 20, 2001 (Dkt. No. 108). Simultaneously with entering and approving the consent decree, Judge Campbell granted Plaintiffs' Motion for Approval of Class Action Settlement (Dkt. No. 96) and Defendants' Motion for Approval of Class Action Settlement (Dkt. No. 98). (*See* Dkt. No. 112.)

The Settlement Agreement provided in pertinent part that: (1) the "court shall have continuing jurisdiction of this action to ensure compliance with the terms of this Settlement Agreement"; (2) any successor agencies to DCS would be bound by the Settlement Agreement's terms; (3) "defendants shall commit all necessary resources . . . to implement all provisions of the Settlement Agreement"; and (4) "DCS shall have the ability to produce aggregate data requested by the Monitor concerning compliance with the provisions of this Settlement Agreement" (Dkt. No. 109, at pp. 4-6).

Under the Settlement Agreement, the Court also appointed an independent monitor to oversee compliance with the Settlement Agreement, and a Technical Assistance Committee (the "TAC") (Dkt. No. 109, Sections XIV & XV, at pp. 37-40). Although stating that "the primary function of the technical assistance committee is advisory," the Settlement Agreement specified that "DCS shall implement the technical assistance committee's recommendations in all areas so specified in this Settlement Agreement" (Dkt. No. 109, Section XIV.B, at p. 38).[5] The initial TAC consisted of five neutral experts in the child welfare field: Steven D. Cohen from the Annie E. Casey Foundation, Carolyn Lapsley from the Alabama Department of Human Resources, Judith Meltzer from the Center for the Study of Social Policy, Andy Shookhoff from the Vanderbilt Child and Family Policy Center, and Paul Vincent from the Child Welfare Policy and Practice Group. (*See* Dkt. No. 109, at p. 37 and the TAC's December 10, 2003 initial report (docket number unavailable).)[6]

---

[5] The Settlement Agreement required the TAC to advise DCS on child welfare policy, management, and practice issues delineated in the agreement (Dkt. No. 109, Section XIV.B, at p. 37).

[6] The TAC's December 10, 2003 initial report can be found here: http://www.childrensrights.org/wp-content/uploads/2008/12/2003-12-10_tn_status_report.pdf. The TAC currently comprises Steven D. Cohen from the Center for the Study of Social Policy, Judith Meltzer from the Center for the Study of Social Policy, Andy Shookhoff, and Paul Vincent from the Child Welfare Policy and Practice Group (Dkt. No. 578-1, at p. 2). While the original Settlement Agreement included one sole Monitor, that Monitor resigned from the case in December 2003 and was replaced by the TAC, which was appointed to function as the independent monitor in the place of the original monitor

8

After an erratic start in implementing the required reforms, Plaintiffs filed a motion for contempt of the consent decree on November 20, 2003 (Dkt. No. 169). The motion was resolved by the parties' negotiations the following month, leading to a stipulation calling for increased compliance with the Settlement Agreement (Dkt. No. 190), including DCS' establishing a formal implementation plan delineating goals, strategies, action steps, benchmarks, responsibilities, and timelines, as well as developing a leadership and management team, a sufficient and well-qualified workforce, and appropriate placement processes, and implementing Child and Family Team Meetings as an essential practice strategy of the reform effort (Dkt. No. 190, at pp. 2-4). DCS, with the assistance of the TAC, was ordered to develop the implementation plan with regular input from Plaintiffs (Dkt. No. 190, at pp. 6-7).

This was followed by a period of improved agency performance sufficient to lead to the parties' negotiation in 2008 of a Modified Settlement Agreement that extended the period of court monitoring; continued the TAC in the role of independent monitor; provided that Defendants would continue to fund the TAC's monitoring and technical assistance functions and assume full responsibility for funding the TAC after 2008; and implemented other modifications to the 2001 Settlement Agreement, which Judge Campbell approved on October 1, 2008 (Dkt. No. 282).

In the course of this litigation, Tennessee's child-welfare system has been through three governors and six DCS commissioners, and periods of rapid improvements and setbacks. Plaintiffs have sought court intervention on several occasions to address urgent compliance concerns. Consistently, the parties—with the active involvement of the TAC—have been able to address these concerns and resolve them through negotiation.

_____

(Dkt. No. 190, at p. 9, ¶ 16). Although the TAC was initially supposed to work with the parties to identify an independent monitor at a later date (Dkt. No. 190, at p. 11, ¶ 22), in 2010, the TAC became the permanent monitor and was also charged with assisting the parties in resolving disputes (Dkt. No. 411).

9

For example, in addition to the contempt motion in 2003, another dispute involved Plaintiffs' challenge to a state law in 2009 that sought to set a limit on the number of children who could enter foster care in each county in Tennessee, after which the county would have to cover the State's cost of the child's care in state custody. Plaintiffs challenged that law as a violation of the Settlement Agreement (Dkt. Nos. 296, 324, 327, 346), and Defendants opposed Plaintiffs' filings (Dkt. Nos. 304, 358).[7]

In 2010, based on progress under then-DCS Commissioner Viola Miller, and after considerable negotiations at the direction of the TAC, the parties significantly modified the consent decree and requested the Court to approve a 2010 Modified Settlement Agreement and Exit Plan (Dkt. No. 410), which the Court approved and entered (Dkt. No. 411). The 2010 Exit Plan superseded and replaced the parties' prior settlement agreement, identified Defendants' ongoing obligations, established a revised monitoring and reporting structure, and set forth exactly what Defendants had to achieve in order to request that the Court terminate jurisdiction.

In particular, the 2010 Exit Plan required Defendants to achieve MAINTENANCE with regard to all Required Provisions in Sections II through XIII and XVI of the 2010 Exit Plan (Dkt No. 411, Section XVIII.D.2). The term MAINTENANCE means that if Defendants maintained or improved performance sufficient to meet the terms of the provisions as reported by the TAC, such performance "shall be considered substantial compliance for purposes of Termination and Exit" (Dkt. No. 411, Section I.D.2, at p. 6). Further, the 2010 Exit Plan provided that once Defendants achieved MAINTENANCE with all the Required Provisions and then sustained MAINTENANCE

---

[7] The Court initially denied Plaintiffs' motion for lack of standing (Dkt. No. 331), but then granted Plaintiffs' Motions for Leave to File Supplemental Complaints (Dkt. Nos. 342, 343), and Plaintiffs filed a Supplemental Complaint and Second Supplemental Complaint (Dkt. Nos. 344, 345), alleging that the state law, which was set to become effective July 7, 2009, violated the consent decree and equal protection and due process by establishing a pre-set limit on the number of children committed to DCS for whom the State would allocate resources (Dkt. No. 376, at p. 2). The Court then denied Defendants' motion to dismiss (Dkt. No. 377), and set the matter for a hearing that was subsequently canceled as moot after the legislation was rescinded. (*See* Dkt. No. 401.)

10

for 12 consecutive months, the Court would terminate its jurisdiction over all provisions except for Section XIX. *Id*.

Section XIX of the 2010 Exit Plan requires Defendants to fund and develop an External Accountability Center to report publicly on Defendants' maintenance of program, policy, and practice improvements for 18 months once Defendants successfully exit jurisdiction under Section XVIII.D. At the end of the 18-month period, Section XIX.D provides that "Defendants shall file an unopposed Notice of Compliance with this Section XIX and a Proposed Order terminating jurisdiction over . . . Section [XIX]" (Dkt. No. 411, Section XIX).

The express terms of the 2010 Exit Plan contemplated that it was to be replaced and superseded annually, following the TAC's issuance of its monitoring report, by an updated exit plan noting the Required Provisions that had achieved MAINTENANCE (Dkt. No. 411, Section XVIII.C.3). Thus, from 2011 through 2015, modified exit plans were approved by the Court in which the MAINTENANCE status of the Required Provisions was set forth. (These can be found at Dkt. No. 434, entered on July 12, 2011; Dkt. Nos. 448/444-1, entered on October 9, 2012; Dkt. No. 500, entered on September 19, 2013; Dkt. Nos. 530/525-2, entered on September 19, 2014; and Dkt. No. 540, entered on April 13, 2015).[8] A review of the amended exit plans entered from 2011 through 2015 reveals that while overall progress was made with regard to MAINTENANCE of the Required Provisions, not all of the provisions were in MAINTENANCE. (*See* Exhibit A to this Joint Motion.)

In October 2012 and January 2013, Plaintiffs sought court intervention to address problems with the Department's information system (Transcript, Dkt. No. 451) and with the Department's

---

[8] In 2012 and 2014, Judge Campbell signed orders on joint stipulations to approve and enter the exit plans, rather than the exit plans; therefore, for those two years, both the order and the Exit Plan are cited to in this Joint Motion and Exhibit A as Dkt. Nos. 448/444-1 and Dkt. Nos. 530/525-2.

system for tracking and investigating child deaths (Transcript, Dkt. No. 475). The parties also resolved these issues through negotiated remedies and with approval of the TAC (Dkt. Nos. 452, 473).[9] In the meantime, then-DCS Commissioner Kathryn O'Day was replaced by Commissioner Jim Henry in February 2013 (Monitoring Report, Dkt. No. 492-1, at p.4). Subsequently, Jim Henry was appointed Chief of Staff to Governor Haslam, and was succeeded at DCS by Bonnie Hommrich in July 2015, who has continued to serve as DCS Commissioner to the present (*see* Monitoring Report, Dkt. No. 545-1, at p. 4).

On April 11, 2016, at the request of both Plaintiffs and Defendants (the "2016 Joint Stipulation," Dkt. No. 554), Judge Campbell approved and entered the April 2016 Modified Settlement Agreement and Exit Plan (the "2016 Exit Plan," Dkt. No. 555), which established that all Required Provisions were in MAINTENANCE as of December 31, 2015. (*See also* Dkt. No. 554, at p. 5, numbered paragraph 8.) Defendants' achievement of MAINTENANCE on all Required Provisions was based on the findings in the monitoring reports of the TAC filed on February 8, 2016 (Dkt. No. 552-1) and April 4, 2016 (Dkt. No. 554-1).

While recognizing that "it has been a bumpy road," Judge Campbell stated at the April 11, 2016 status conference: "I am impressed that all the various categories have achieved maintenance" (Transcript, Dkt. No. 557, at p.18).

Pursuant to the 2016 Exit Plan, Section XVIII.D.2, and each of the exit plans entered since 2010, if Defendants sustained MAINTENANCE on all Required Provisions for 12 months, Defendants could request that "the court issue an order terminating jurisdiction" over this litigation

---

[9] Although not a separate provision in the exit plans, the issue of Child Death Reviews (CDRs) was recognized by the Court as touching on several Required Provisions (Transcript, Dkt. No. 475, at pp. 52-54) and the TAC reported on MAINTENANCE for the CDR process (*see*, *e.g.*, Dkt. Nos. 546-1, 552-1, 554-1, 576-1).

(except for Section XIX). In fact, Defendants sustained MAINTENANCE with all Required Provisions throughout the following 12 months—through December 31, 2016.

On May 16, 2017, Plaintiffs and Defendants filed the Parties' Joint Stipulation Seeking Court Approval (Dkt. No. 579) of the Proposed April 2017 Modified Settlement Agreement and Exit Plan (Dkt. No. 579-1). That submission is pending before the Court. The conclusion that Defendants have sustained MAINTENANCE on all Required Provisions from December 31, 2015 through December 31, 2016, as set forth in the 2017 Exit Plan and the Parties' Joint Stipulation, is based on the findings of the April and May 2017 TAC reports (Dkt. Nos. 576-1, 578-1).[10]

The 2017 Exit Plan establishes that all Required Provisions continue to be and are in MAINTENANCE. Moreover, the Parties' Joint Stipulation makes it clear that the Required Provisions were in MAINTENANCE "no later than December 31, 2015, and Defendants sustained MAINTENANCE status on all provisions in Sections II through XIII and XVI throughout the full calendar year of 2016" (Dkt. No. 579, numbered paragraph 1). The 2017 Exit Plan also describes the funding and functioning of the External Accountability Center ("EAC") to be established under Section XIX of the Settlement Agreement, and the planned content and frequency of public reporting for 18 months, if the Court enters the 2017 Exit Plan, and if the Court grants the parties' instant Joint Motion. Finally, the Parties' Joint Stipulation spells out the roles of Chapin Hall and the Vanderbilt Center of Excellence in this case thus far and why the parties and the TAC agree that they are best suited to comprise the EAC (Dkt. No. 579, numbered paragraphs 3 through 8).[11]

---

[10] Where performance declined on any Required Provision, the TAC determined and the parties agreed that slippage did not merit removal from MAINTENANCE (Dkt. No. 576-1, at p. 2) ("[a] certain amount of fluctuation is to be expected from year to year, and that is reflected in the data presented, with improved performance in some areas and a decline in others.").

[11] DCS and the TAC have been working with Chapin Hall in a technical assistance capacity for over 10 years, primarily focusing on measuring, analyzing, and reporting on DCS performance (Dkt. No. 545-1, at p. 25). The TAC has regularly worked with the Vanderbilt Center on general child risk assessment support, placement of children in their home communities, and implementation of the annual Quality Service Review (Dkt. No. 545-1, at p. 288).

## II.     PROGRESS OF COMPLIANCE WITH SETTLEMENT TERMS

A. <u>Performance Measures/Required Provisions</u>

The practice of designating provisions with which DCS had achieved substantial compliance as being in "MAINTENANCE" did not begin until 2010, when a modified settlement agreement was negotiated between the parties and approved by the Court (Dkt. No. 411). Since then, all exit plans presented to and approved by the Court designated the Required Provisions that were in MAINTENANCE. From 2010 through the present, nine exit plans have been presented to the Court and eight have been approved: 2010 Exit Plan (Dkt. No. 411); 2011 Exit Plan (Dkt. No. 434); 2012 Exit Plan (Dkt. Nos. 448/444-1); 2013 Exit Plan (Dkt. No. 500); 2014 Exit Plan (Dkt. Nos. 530/525-2); April 2015 Exit Plan (Dkt. No. 540); September 2015 Exit Plan (Dkt. No. 547); 2016 Exit Plan (Dkt. No. 555); and 2017 Exit Plan (Dkt. No. 579-1) (collectively, the "Exit Plans"). Only the 2017 Exit Plan (Dkt. No. 579-1) is pending approval.

Attached as Exhibit A is a spreadsheet displaying the MAINTENANCE history for each of the Required Provisions (the "Maintenance Spreadsheet"). In addition, the Maintenance Spreadsheet specifies the Exit Plan in which each provision came into MAINTENANCE and then sustained MAINTENANCE status through December 31, 2016  (this designation is noted with an "M" in a larger and bolded font). Finally, the last column of the Maintenance Spreadsheet provides a citation to the TAC report that supports the MAINTENANCE designation for each provision for the year it came into MAINTENANCE (and after which MAINTENANCE was sustained).[12]

---

[12] With regard to the Exit Plan columns in the Maintenance Spreadsheet, the parties note that if a cell is blank for a provision, then that provision was <u>not</u> in MAINTENANCE for that particular exit plan.  If the cell has an M, then the provision was in MAINTENANCE. If the cell has a bold **M**, that shows the year the provision came into MAINTENANCE and that it has been sustained through December 31, 2016.  All Required Provisions have been in MAINTENANCE for at least 12 continuous months. Finally, PM means Partial MAINTENANCE, and designates when a provision was found to be partially in MAINTENANCE.

For example, Section V.J (part two concerning caseloads and weighted equivalents for mixed caseloads of front-line case managers assigned) initially came into MAINTENANCE in the 2010 Exit Plan, but because it then dropped out

14

As the Court can see from the Maintenance Spreadsheet, Exit Plans were filed in the

following years:

- 2010 Exit Plan (Dkt. No. 411)
- o MAINTENANCE designations based on TAC Monitoring Reports ("Report") filed at Dkt. Nos. 287-1,408-1
    - ▪ TAC Supplemental Report, Dkt. No. 301

- 2011 Exit Plan (Dkt. No. 434)
- o MAINTENANCE designations based on TAC Report filed at Dkt. No. 423-1

- 2012 Exit Plan (Dkt. Nos. 448/444-1)
- o MAINTENANCE designations based on TAC Report filed at Dkt. No. 441-1

- 2013 Exit Plan (Dkt. No. 500)
- o MAINTENANCE designations based on TAC Reports filed at Dkt. Nos. 455-1, 492-1
    - ▪ TAC Supplemental Reports, Dkt. Nos. 471-1, 484-1

- 2014 Exit Plan (Dkt. Nos. 530/525-2)
- o MAINTENANCE designations based on TAC Reports filed at Dkt. No. 516-1
    - ▪ TAC Supplemental Report, Dkt. No. 525-1

- April 2015 Exit Plan (Dkt. No. 540)
- o MAINTENANCE designations based on TAC Report filed at Dkt. No. 535-1
    - ▪ TAC Supplemental Report, Dkt. No. 539-1

- September 2015 Exit Plan (Dkt. No. 547)
- o MAINTENANCE designations based on TAC Report filed at Dkt. No. 545-1
    - ▪ TAC Supplemental Report, Dkt. No. 546-1

- 2016 Exit Plan (Dkt. No. 555)
- o MAINTENANCE designations based on TAC Report filed at Dkt. No. 552-1
    - ▪ TAC Supplemental Report, Dkt. No. 554-1

- 2017 Exit Plan (Dkt. No. 579-1)
- o MAINTENANCE designations based on TAC Report filed at Dkt. No. 576-1
    - ▪ TAC Supplemental Report, Dkt. No. 578-1

---

of MAINTENANCE in the 2013 Exit Plan, the larger, bolded **M** appears in the column for the April 2015 Exit Plan when it came back into MAINTENANCE sustained through December 31, 2016; further, the TAC report designation for this provision relates to the report immediately preceding the April 2015 Exit Plan. The parties also note that the designations in the last column of the spreadsheet are to the pdf page number of the ECF filing, rather than to the page number in the unfiled version of the report.

At the time the 2010 Exit Plan was approved, about half of the approximately 140 Required Provisions were found to be in MAINTENANCE. The earliest provisions to receive this designation related to: agency structure; case management staff training; case manager caseloads; placement standards; key policy and practice standards; timeliness of activities related to freeing a child for adoption; recruitment of foster parents; quality assurance reviews; and many of the critical outcome measures such as timeliness of permanency for children and placement stability. In the years that followed, the parties negotiated MAINTENANCE designations based upon the TAC monitoring reports.

Over the next three years (2010 to 2013), an additional seven provisions came into MAINTENANCE, and six provisions fell out. Key provisions coming into MAINTENANCE related to case manager responsibilities, foster parent recruitment and retention, trial home visits, and private provider oversight. Some of the provisions that fell out of MAINTENANCE involved case management caseloads, timeliness of case documentation, use of restraints and seclusion, and timeliness of permanency for children.

Beginning in 2014, DCS made consistent progress towards full MAINTENANCE for each Required Provision—from this point forward, no Required Provisions fell out of MAINTENANCE. The 2014 Exit Plan designated 14 new provisions primarily involving availability of services to children and families, human resources, and quality assurance reviews as in MAINTENANCE (Dkt. Nos. 530/525-2, at p. 2). The 2015 Exit Plan approved over 22 new provisions as being in MAINTENANCE (Dkt No. 539, at p. 2). During that year, all provisions related to Child Protective Services screening and completion of investigations received the designation, as did provisions related to placement standards, Child and Family Team meetings,

16

freeing children for adoption, the DCS information system, and almost all remaining outcome measures.

The 2016 Exit Plan reflects that the remaining Required Provisions moved into full MAINTENANCE based upon performance as of December 31, 2015. With compliance of these provisions, primarily involving placement standards (such as oversight of the use of psychotropic medications and physical restraints on children), Child and Family Teams, and a final outcome measure related to timeliness of permanency, the Department demonstrated full compliance with all of the Required Provisions of the Exit Plan.[13]

The second stage of the Exit Plans required DCS to show the durability of reforms by simultaneously sustaining performance on all Required Provisions for 12 months. That time frame began January 1, 2016 and ran for the remainder of the calendar year. The TAC's 2017 reports reflect the Department's performance (and sustained MAINTENANCE) for that time period and provide the basis for the parties' subsequent filings and the relief requested in this Joint Motion.

B. Factual Examples of Compliance

As the TAC has concluded, in achieving MAINTENANCE status on all the Required Provisions in Sections II through XIII and XVI pursuant to the consent decree, DCS underwent a

---

[13] Each Exit Plan was the product of intensive review and negotiations by the parties, under the direction and supervision of the TAC, concerning which of the Required Provisions warranted MAINTENANCE status. Prior to every finalized TAC report, the parties received confidential draft TAC reports and had multiple meetings, by phone and in person, to raise questions about data and performance and to share input. On many occasions, disputes over MAINTENANCE status resulted in the TAC's filing supplemental reports providing clarifying information (*see*, *e.g.*, Dkt. Nos. 471-1, 525-1, 539-1, 546-1, 554-1, 578-1). Circumstances in which the parties did not agree to a MAINTENANCE designation and the TAC exercised its authority under Section XVIII.C.2 of the Exit Plan to make the determination were rare. In one example, in 2015, the parties disputed the MAINTENANCE status of Section III.A (a specific aspect of investigations caseloads and timing of investigation completion) and the TAC determined that Section III.A *would* go into MAINTENANCE. (*See* Dkt. No. 546-1, at pp. 2-4, 5-8.) Thus, the process of robust arm's length vetting of draft TAC reports and the issue of MAINTENANCE has provided a high measure of accountability over the achievement of the reforms embodied in the Required Provisions.

significant transformation to better serve the safety, well-being, and permanency of Tennessee's children in foster care.[14]

Attached as Exhibit B is a fact sheet identifying a number of improvements for the Class by comparing current data to key allegations of systemic problems from the Complaint. Areas of improvement documented by the TAC include reduced caseloads and improved caseworker training; increased caseworker visits of children; improved case planning and assessments of children; more children being placed in family settings, with siblings, and closer to home; DCS' improved data system; strict oversight of the use of psychotropic drugs and physical restraints; more children being more quickly reunified with their parents; increased parent-child and sibling visitation; more stable placements and shorter stays in custody; faster adoption for children who cannot be reunified with their birth families; ongoing efforts to address racial disparity; and better education and improved services for older youth in care.

Just a few of the marked improvements in Exhibit B include:

- At the time of the Complaint, worker caseloads over 40 children were "not unusual," and one region's case managers had caseloads as high as 80. Now, 94 to 96 percent of all case managers have caseloads within reasonable limits (set between 10 to 20 children per worker depending on the type of worker) (Exhibit B, at p. 1).

- In May 2000, placing children was a bed-driven system: the Complaint alleged that DCS "sticks children wherever there is a bed, regardless of the appropriateness." Now, 99 percent of children are appropriately housed in placements that can meet their needs. The Department "is doing a good job of continually evaluating a child's placement to ensure that the placement meets the child's needs" (Exhibit B, at p. 2).

- In 2004, "[t]hirteen percent of children with a goal of reunification had no documented visits with their parents in the nine-month review period and an additional 41% had less than monthly visits";

---

[14] For example, the TAC has noted: "Tennessee . . . has transformed what had been a problem-plagued child welfare system into one that, while not without challenges, embraces best practices and is appropriately considered in many areas to be a national model" (Dkt. No. 578-1, at p. 3); "In stark contrast to the allegations in the complaint, the current experience of children in foster care in Tennessee is dramatically different" (Dkt. No. 578-1, at p. 5); "The TAC continues to be impressed with the ways in which the Department's approach to quality assurance has developed and matured and is confident in the Department's capacity to support any of the TAC's QA activities that will continue to be of value after exit from court jurisdiction" (Dkt. No. 576-1, at p. 2).

18

the April 2017 Monitoring Report shows that 97 to 100 percent of children who are on a track towards reunifying with their parents are now visiting with their parents at least once per month, and 76 to 81 percent are visiting at least twice per month (Exhibit B, at p. 6).

- At the time of the Complaint, children were "often placed at a great distance from their parents and siblings." Now, "[c]hildren entering foster care in Tennessee are . . . much less likely to be separated from their siblings." In the most recent data, 82 percent of siblings were placed together (Exhibit B, at p. 6).

- In May 2000, 36 percent of children were in custody for over two years, and 17 percent in custody for over four years. Now, 78 percent of children exit in two years or less, and only 9 percent are in custody for more than three years (Exhibit B, at p. 7).[15]

As the Court can see from Exhibits A and B, the progress of compliance with the settlement terms has not always been smooth, but over time Defendants met and then simultaneously sustained the Required Provisions. The TAC has noted that: "The success of Tennessee's reform required continued focus and hard work by DCS leadership, front-line staff, private providers, resource parents, and advocates and consistent support for that work from the Governor and the Legislature. Sustaining and building upon that success will require no less" (Dkt. No. 578-1, at p. 14).[16]

## III.  SCOPE OF REVIEW OF THIS JOINT MOTION

The scope of review in this matter rests in this Court's authority to ensure compliance and enforcement of the validly entered consent decree on behalf of a certified class of children under Fed. R. Civ. P. 23. Specifically, pursuant to the express terms of the April 2016 Exit Plan (Dkt. No. 555), the Court's scope of review on this Joint Motion is to determine whether: (1) Defendants' performance as of December 31, 2016, as reflected in the TAC reports (Dkt. Nos. 576-1, 578-1)

---

[15] Citations in Exhibit B are to page numbers of the ECF filings.
[16] Over time, the TAC's role has increasingly shifted from independently *generating* data toward independently *validating* data generated by the Department. To ensure a smooth transition as the TAC's role comes to an end (if the Court grants this Joint Motion), the Department has hired two TAC staff members to support its quality assurance efforts, and Chapin Hall has hired a third TAC staff member to help staff the EAC (Dkt. No. 578-1).

and the Parties' Joint Stipulation (Dkt. No. 579) supports the TAC's findings and the parties' agreement that Defendants have sustained MAINTENANCE on all obligations in Sections II through XIII and XVI for 12 months; (2) whether this Court should accordingly enter the proposed 2017 Exit Plan (Dkt. No. 579-1); and (3) whether this Court should order partial termination of jurisdiction over all obligations except for Section XIX of the Exit Plan regarding the External Accountability Reporting Structure.

"Consent decrees have elements of both contracts and judicial decrees*." Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citation omitted).

> A consent decree "embodies an agreement of the parties" and is also "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

*Id.*; *see United States v. ITT Continental Baking Co.*, 420 U.S. 223, 235-38 (1975) (consent decrees construed as contracts but enforced as court orders); *see also Stotts v. Memphis Fire Dep't*, 679 F.2d 541, 557 (6th Cir. 1982*), rev'd on other grounds sub nom. Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561 (1984) (holding that "[a] decree is always specifically enforceable as written" and that a court "has an independent duty to ensure that the terms of the decree are effectuated" and "to protect the integrity of its decree"); *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983) ("A consent decree has attributes of both a contract and of a judicial act" and "should be strictly construed to preserve the bargained for position of the parties").

As stated by the Supreme Court (in the context of Fed. R. Civ. P. 60(b)(5)), a "federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Frew*, 540 U.S. at 442; *accord Horne v. Flores*, 557 U.S. 433, 450 (2009) ("A flexible

approach allows courts to ensure that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant."); *accord John B. v. Emkes*, 710 F.3d 394, 412 (6th Cir. 2013) ("we must take a 'flexible approach' to these [Rule 60(b)(5)] motions so that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant.'"). Here, the parties expressly agreed to the achievements that would define durability of the reforms required under the consent decree—achieving MAINTENANCE status on all provisions under Section II through XIII and XVI and sustaining MAINTENANCE status for 12 months—thereby supporting the partial termination requested in this Joint Motion.

In the instant case, the initial Settlement Agreement as entered by Judge Campbell, as well as the governing 2016 Exit Plan, expressly provide that the Court "shall have continuing jurisdiction of this action to ensure compliance with the terms of this Settlement Agreement for as long as the Settlement Agreement remains in effect" (Dkt. No. 109, Preamble, Section C; *see* Dkt. No. 555, Preamble, Section C). Over the years, the Court has repeatedly exercised its power to review, modify, and enforce the terms of the consent decree. (*See, e.g.*, Dkt. Nos. 110, 190, 289, 529.)

The performance detailed in the TAC's reports fully supported Judge Campbell's determination in April 2016 that Defendants had achieved MAINTENANCE status on all the Required Provisions (Dkt. No. 555). Based on the most recent monitoring reports by the TAC, (Dkt. Nos. 576-1, 578-1), the parties have filed this Joint Motion and agree that, in accordance with Section XVIII.D.2 of the 2016 Exit Plan, "Defendants have achieved and simultaneously sustained MAINTENANCE status on all provisions in Sections II-XIII and XVI [of the Settlement Agreement] for a period of twelve (12) months" and therefore "Defendants may request that the

court issue an order terminating jurisdiction over all provisions of [the] agreement, except for Section XIX" (Dkt. No. 555, at p. 37).

The record in this case unequivocally supports entry of the proposed April 2017 Modified Settlement Agreement and Exit Plan (Dkt. No. 579-1). Accordingly, the parties respectfully request that this Court grant this Joint Motion and issue an order granting partial termination of jurisdiction over all provisions of the Settlement Agreement except Section XIX.[17]

## CONCLUSION

The 2016 Exit Plan (Dkt. No. 555) and the 2017 TAC reports (Dkt. No. 576-1, 578-1) illustrate that Defendants have achieved MAINTENANCE on all Required Provisions and have maintained that status for the required 12 months. Plaintiffs agree that the Defendants have fully complied with the requirements for partial termination of jurisdiction. Accordingly, this Court should: (1) enter the proposed April 2017 Modified Settlement Agreement and Exit Plan (Dkt. No. 579-1); and (2) grant this Joint Motion and issue an Order granting partial termination of jurisdiction over all obligations except for Section XIX.


DATED:            June 22, 2017
                 Nashville, TN

---

[17] At the June 8, 2017 status conference, the Court inquired regarding any attorney's fees (Transcript, Dkt. No. 586, at p. 14). If the Court grants this Joint Motion, Plaintiffs will present to Defendants a request for fees and expenses for the most recent period from November 1, 2016 to the date partial exit is granted, to the extent authorized by 42 U.S.C. § 1988. (*See* Dkt. No. 577 (approving fees for the period November 1, 2015 to October 31, 2016).) The parties will attempt to resolve this request for fees and expenses through negotiation as they have done repeatedly over the years of this action (*see* Dkt. Nos. 241, 252, 257, 273, 279, 285, 291, 403, 428, 440, 482, 508, 538, and 560 approving negotiated fees and expenses), and will either present an unopposed motion for this Court to consider or a disputed motion in the event agreement cannot be reached. If the Court grants this Joint Motion, any subsequent request for fees and expenses related to the remaining Section XIX will be addressed in similar fashion.

22

**APPROVED FOR ENTRY:**

**ATTORNEYS FOR PLAINTIFFS:**

 /s/ Ira Lustbader
IRA LUSTBADER (*pro hac vice*)
DANIELE GERARD (*pro hac vice*)
CHILDREN'S RIGHTS, INC.
88 Pine Street, Suite 800
New York, NY 10005
(212) 683-2210

 /s/ David L. Raybin
DAVID L. RAYBIN (TN BPR #003385)
RAYBIN & WEISSMAN, P.C.
424 Church Street, Suite 2120
Nashville, TN 37219
615-256-6666 Ext. 220

JACQUELINE B. DIXON (TN BPR #012054)
WEATHERLY, MCNALLY AND DIXON, P.L.C.
424 Church Street, Suite 2260
Nashville, TN 37219
(615) 986-3377

**OF COUNSEL FOR PLAINTIFFS**:

ROBERT LOUIS HUTTON (TN BPR #15496)
GLANKLER BROWN, PLLC
6000 Poplar Avenue, Suite 400
Memphis, TN 38119
(901) 525-1322

WADE V. DAVIES (TN BPR #016052)
RITCHIE, DILLARD, DAVIES & JOHNSON, P.C.
606 W. Main Street, Suite 300
Knoxville, TN 37902
(865) 637-0661

**ATTORNEYS FOR DEFENDANTS:**

/s/ Alexander S. Rieger
ALEXANDER S. RIEGER (TN BPR #29362)
Deputy Attorney General
General Civil Division
P.O. Box 20207
Nashville, TN 37243
(615) 741-2408

/s/ Jonathan P. Lakey
JONATHAN P. LAKEY (TN BPR #16788)
PIETRANGELO & COOK, PLC
6410 Poplar Avenue, Suite 190
Memphis, TN 38119
(901) 685-2662

## <u>CERTIFICATE OF SERVICE</u>

I, Ira Lustbader, hereby certify that, on June 22, 2017, a true and correct copy of this Joint Motion for an Order Partially Terminating Jurisdiction and Partially Dismissing Case with Prejudice in the case of *Brian A. v. Haslam*, has been served on Defendants' counsel Alexander S. Rieger, Deputy Attorney General, General Civil Division, P.O. Box 20207, Nashville, TN 37243, and Jonathan P. Lakey, Pietrangelo & Cook, PLC, 6410 Poplar Avenue, Suite 190, Memphis, TN 38119, electronically by operation of the Court's electronic filing system.

DATED:          June 22, 2017

/s/ Ira Lustbader____